Rickey Dale CONLEY et al., Plaintiffs-Appellants,

v.

LAKE CHARLES SCHOOL BOARD et al., Defendants-Appellees.

No. 30100.

United States Court of Appeals, Fifth Circuit.

Aug. 25, 1970.

Jack Greenberg, Norman J. Chachkin, Margrett Ford, New York City, for plaintiffs-appellants; Edmund G. Glass, Cravath, Swaine & Moore, New York City, of counsel.

Frank T. Salter, Jr., Dist. Atty., Henry L. Yelverton, Asst. Dist. Atty., Lake Charles, La., for defendants-appellees.

Before BELL, AINSWORTH and GODBOLD, Circuit Judges.

GODBOLD, Circuit Judge:

In this appeal we review the order of the District Court approving a desegregation plan for the school system of Calcasieu Parish, Louisiana, to determine if the plan meets constitutional standards for a unitary system.[1] The order of the District Court was entered June 11, 1970, and the appeal has been expedited in accordance with our *Single-*

---

1. We understand that the school board is now correctly described as the Calcasieu Parish School Board, as a result of consolidation of boards.

*ton*[2] procedures. We have considered the briefs and record, and, in addition, at the direction of the court, counsel for all parties, together with school officials, have conferred with the court and the court has been furnished substantial additional data necessary for a decision of the case.

We must review the six criteria for determining if a dual school system has been converted to a unitary, non-racial system, set out in Green v. County School Board of New Kent County, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968) and since applied repeatedly in the decisions of this circuit: composition of student bodies, faculty, staff, transportation, extracurricular activities, and facilities.

The Calcasieu Parish system is parish-wide, and contains one large city, Lake Charles. The parish is divided into six wards, in which there are approximately 66 schools.[3] Ward 3, which includes both the city of Lake Charles and areas adjacent to it, contains approximately 36 schools,[4] all within or near the city limits. It is this ward which presents the most difficult problems. Ward 3 has a land area of approximately 155 square miles. The residential pattern of Lake Charles is largely black in its north end, largely white in the south end.

For the 1970–71 school year the projected enrollment for the entire system is 38,837 students, 28,762 whites (74%) and 10,075 blacks (26%).

For Ward 3, projected 1970–71 enrollment is 22,321 students, 14,303 whites (64%) and 8018 blacks (36%).

Approximately 6500 to 7000 students were bussed to Ward 3 schools in 1969–70.

A biracial committee has been appointed, consisting of nine whites and nine blacks.

**1.**

With respect to transportation, extracurricular activities and facilities no objections have been made to the order of the District Court, and we find it to be correct.

The District Court order requires majority to minority transfer with the conditions of Ellis v. Board of Public Instruction of Orange County, 423 F.2d 203 (5th Cir. 1970) to be applicable. Thus a student transferring is given absolute priority for space, and he must be furnished free transportation. Ordinarily this priority provision will work in the following way:

This priority provision, of course, applies only to transfer requests made prior to the beginning of each school term. When a transfer request is received by the school board during a school term, it may be denied at that time if there is no space available in the school to which the student wishes to transfer. In such a situation the transfer request will be deferred until the beginning of the next school term, at which time the transfer applicant will be given an absolute priority for space.

Allen v. Board of Instruction of Broward County, Florida, 432 F.2d 362 (5th Cir., 1970). However, because the opening of school is at hand, and various changes are made by this court in student assignment, majority to minority transfer requests shall be honored if received within 14 days after the schools open. This requirement must be given thorough publicity to students and their parents.

**2.**

The District Court order includes the *Singleton* requirements for staff and faculty. No complaint is made that as between schools these standards are not

2. Singleton v. Jackson Municipal Separate School District, 5 Cir. 1970, 419 F.2d 1211, 1222 (en banc), rev'd in part on other grounds sub nom. Carter v. West Feliciana Parish School Board, 1970, 396 U.S. 290, 90 S.Ct. 608, 24 L.Ed.2d 477.

3. We say "approximately" because in some instances schools, though in separate structures which bear different names, are adjacent to each other or very close and are treated by the board as a single school.

4. See footnote 3, *supra*.

being carried out. However, the Negro plaintiffs assert that system-wide the board has systematically reduced the proportion of black teachers employed in the parish. Alternatively they assert that the number of black teachers has decreased as a result of closing black schools because of desegregation. The record does not establish these assertions. As to the latter it appears that all black teachers from closed black schools have been absorbed in the system. .

■ As best we can tell, what plaintiffs really are claiming is that as places have become vacant from attrition not related to race and from diminished faculty requirements at some grade levels resulting from closing black schools, the Board's hiring practices in filling such vacancies have caused the number of black teachers in the system, and the proportion of black teachers in the system, to decrease while the number and proportion of white teachers have in creased. If the complaint is of hiring practices, it must be presented first to the District Court. We do not have before us findings, a record, or even sufficiently clear statements of what is claimed for us to consider that issue. The bare statistics showing that for three years black teachers increased from 390 in the first year to 417 in the second, and decreased to 397 in the third, while whites increased from 1255 to 1379 to 1426, do not establish racially discriminatory hiring practices.

3.

The District Court found the parties to be in agreement that, except for Wards 3 and 4, the school system is unitary with respect to student assignment. No objections are made to this finding. As to

Ward 4, the record is slim, but plaintiffs interpose no objections to the finding that the system in that ward is unitary and we will not disturb it. Of the approximately 28 schools, of all levels, in the wards other than Ward 3, only one has a heavily black student body. The schools in these wards have projected 1970–71 enrollment of 16,516 students, 14,459 white (88%) and 2057 black (12%).[4A]

The major issue is student assignment in Ward 3. Several plans have been before the District Court since the case was remanded by Hall v. St. Helena Parish School Board, 417 F.2d 801 (5th Cir. 1969). Geographic zoning has been in effect since July, 1969. Following a hearing in April, 1970 the District Court concluded that the amended Board plan then presented did not convert the system to a unitary one and directed that zones in Ward 3 be redrawn so that each student would be assigned to attend the school nearest his home, limited only by the capacity of the school, as in Ellis v. Board of Public Instruction of Orange County, 423 F.2d 203 (5th Cir. 1970). The Board presented what appeared to be such a plan. The plaintiffs concede that it contained "no trickery, no devices, no gerrymandering." Also, the HEW plan prepared in the summer of 1969 was before the court. The latter provides for pairing or clustering of schools, some close together, others many miles apart, and massive crosstown bussing. The District Court rejected it with the finding that "[v]iewed from any direction, it would be a disaster."[5]

For the elementary grades and some junior high grades and one high school, the neighborhood plan which the Board submitted and the District Court ap-

---

**4A.** One of the means employed in these wards to end the dual systems has been pairing of schools.

**5.** The court found that testimony given in support of the HEW plan acknowledged that consideration had not been given to the impact of the plan educationally or economically, and that the statistical data of the resulting integration of student

bodies contained glaring inconsistencies. If found that there would be a 150% increase in the number of students transported by bus, requiring 85 additional buses and 85 additional drivers (the system has 61 buses). The increase in cost which would be incurred the first year from additional bus transportation was found to be close to a million dollars.

proved was not adjusted for the maximum capacities of schools. The approved plan stated that "adjustments [in student assignment] will have to be made for capacities." When capacities are matched against the assignments made by the neighborhood zones it is immediately apparent that a number of changes and adjustments must be made. The Board states that it planned to present to the District Court the matter of adjustments necessitated by overcapacity but before it could do so this appeal was filed. Under the requirements of Alexander v. Holmes County Board of Education, 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed. 2d 19 (1959), we cannot await further proceedings at the District Court level to establish a constitutionally acceptable plan. A plan must be put into effect now under which the system will begin to operate immediately as a unitary system. The beginning of school is at hand. At the appellate level our alternatives are that we order the HEW plan put into effect immediately or that we make such changes and adjustments in the plan approved by the District Court as will bring it up to constitutional standards. For reasons set out below we have chosen the latter alternative.

Appendix A contains data for all Ward 3 schools based on projected 1970–71 enrollment. Considering approximately 90% or more black students as creating a black school, of approximately 36 schools in Ward 3 the plan approved by the District Court left in existence for the 1970–71 school year three black elementary schools (Cherry Street, Mill Street, and Opelousas/Jackson), a black junior-senior high school (Washington), and Lincoln (grades 1–8), which is so close to being black and so startlingly

overcrowded as. to require consideration along with the others: [6]

| Zone No. | School | Grades | Wh. | Bl. | Total | % Bl | Cap. | Over Cap |
|---|---|---|---|---|---|---|---|---|
| E-4 | Cherry St. | 1-6 | 6 | 873 | 879 | 99.3% | 630 | 249 |
| E-7 | Mill St. | 1-6 | 8 | 492 | 500 | 98.4% | 840 | 340 |
| E-3 | Opelousas/Jackson | 1-6 | 17 | 706 | 723 | 97.6% | 1260 | |
| E-2 and J-1 | Lincoln | 1-8 | 223 | 1409 | 1632 | 86.3% | 990 | 642 |
| J-3 and H-2 | Washington | 7-12 | 38 | 1454 . | 1492 | 97.5% | 1590 | |
| | | | 292 | 4934 | 5226 | | | 1231 |

[A3000]

The 5226 black students in these schools constitute 65% of the 8018 black students in Ward 3[7] and 52% of the blacks in the system. To relieve the overcapacity in the Cherry Street, Mill Street and Lincoln schools, places must be found elsewhere in the system for more than 1200 children, most of them black.

As to Ward 3, the Board plan is not up to constitutional standards. In many circumstances the *Orange County* approach of neighborhood schools is adequate to convert a school system from a dual to a unitary system. But, as *Orange County* itself makes clear, 423 F.2d at 208, footnote 9, each case turns on all of its own facts, including those peculiar to the particular system. In Ward 3 of this system, a plan which leaves two out of three black children in Lake Charles in schools all black or substantially so, and more than 1200 of those in schools that have no places for them, cannot be upheld as constitutional.

We have considered the strong plea of the plaintiffs that we order the HEW plan put into effect forthwith. We will not lightly overturn the District Court's finding that the HEW plan is administratively, economically and educationally unsound. Andrews v. City of

6. Marion (J–4 and H–1) and Kennedy (E–11), which are integrated schools, also are substantially overcapacity in assignments. Their condition is relieved by the adjustments made in this opinion.

7. Reynaud (J–2) is 86% black. It is not overcapacity. When it is included with the above schools, the number of blacks in Ward 3 attending schools all black, or substantially so, becomes 5454, or 68% of those in the ward, 54% of those in the system.

Monroe, 425 F.2d 1017 (5th Cir., 1970). We have considered also the possibility of pairing or clustering schools, an approach strongly opposed by the Board. In this instance that approach would involve many schools and a sweeping relocation of students. We choose instead the less drastic alternative of applying adjustments to the approved plan to substantially relieve the overcapacity schools and to bring the plan up to constitutional standards.

We direct that the following adjustments be made in the plan approved by the District Court:

In the Lincoln (E–2) zone: the area from Prater Street west to the Calcasieu River will be assigned to Central (E–8). The area from Booker Street west to Prater Street will be assigned to Hamilton (E–9). The area of Lincoln (E–2) zone south of the following line will be assigned to Rosteet (E–10): from Booker Street east on Katherine to Lincoln, south on Lincoln to Moelling, east on Moelling, to U. S. Highway 171.

In Riverside (E–1) zone, the area north of English Bayou is assigned to Cherry Street (E–4).

In the Cherry Street (E–4) zone: the area bounded on the north by the north line of the zone on the west by N. Shattuck, on the south by Martha to Booker and Cessford from Booker to Simmons, and on the east by Simmons, is assigned to Rosteet (E–10).

The North-South line between the Cherry Street (E–4) zone and Eastwood (E–5) zone is moved west to Simmons, from the railroad on the south to Brooks Street (extended) on the north.

The line between Opelousas/Jackson (E–3) zone and Central (E–8) zone is moved south to Broad.

The following area is added to the Mill Street (E–7) zone: south along First Avenue from Second Street to Sixth Street, east to Fifth Avenue, north along Fifth Avenue and the prolongation thereof to Mill Street.

That part of the Hamilton (E–9) zone west of Bank is added to Central (E–8) zone.

The west and north lines of Kennedy (E–11) are moved so as to run along Highway 14 (U.S. 171) north from the railroad to Eighth Street, thence east to McNabb (extended), thence north to Sixth Street, thence east on Sixth Street and a line extended east therefrom. The areas of the Kennedy (E–11) zone north and northwest of this line are added to the Rosteet (E–10) zone.

The east-west line between Kennedy (E–11) and Greinwich/Fairview (E–21) is moved north and shall run along the railway.

Only a small number of students attend grades 7–8 at Marion (J–4) and Carver (J–5), and Marion is overcapacity. Grades 7–8 are to be closed at these two schools, and the students who would have attended them are to attend Washington (J–3).

Students in grades 7–9 residing in that part of the Rosteet Jr. (J–6) zone north of old Highway 90 are to attend Washington (J–3 and H–2).

The south boundary of Reynaud (J–2) is moved so as to run as follows: Kirby Street from the lake east to Ryan, south on Ryan to Iris, east on Iris to Louisiana, south on Louisiana to Third Street, east on Third Street to Second Avenue, south on Second Avenue to Fifth Street, east on Fifth Street to Sixth Avenue. The east boundary of Reynaud (J–2) is extended south along Sixth Avenue from Second Street to Fifth Street.

The boundary common to Washington (H–2) and Boston (H–3) is moved so as to coincide, between the west end of Fournet Street and the intersection of Church and N. Shattuck, with the boundary common to Washington (J–3) and Reynaud (J–2). In the west end of

the Washington zones (H–2 and J–3) from that common south boundary to the north boundary of J–3, all students in grades 7–9 will be assigned to Watson Junior (J–7), and all students in grades 10–12 will be assigned to Lake Charles High (H–4).

In the Marion zone (H–1), the area east of Kayouchee Coulee between the Southern Pacific R. R. and old Highway 90 [Broad Street extension] is assigned to Washington (H–2). All white students living north of Medora Street in the Marion Zone (H–1), in grades 9–12, are assigned to Washington (H–2).

The boundary common to Boston (H–3) and Lake Charles (H–4) is moved so as to coincide, between Kirby Street at the lake and the intersection of Fifth Street and Fourth Avenue, with the boundary common to Reynaud (J–2) and Watson (J–7).

Changes in student assignments as a result of these adjustments will require changes in transportation arrangements, the details of which can be established by the Board subject to the *Singleton* requirements.[8] As a minimum the Board shall continue its present practice of furnishing transportation to each child who lives more than one mile from the school which he attends.

As a result of these adjustments in Ward 3, schools affected by them will have projected 1970–71 enrollment as shown in Appendix B. If Cherry Street is treated as still segregated, the projected number of black students in Ward 3 attending black or substantially all-black schools is reduced from 5226 to the 533 at Cherry Street, from 65.% of the black students in the ward to 7%. Of the five schools which under the District Court-approved plan were all black, or substantially black and overcapacity, all will, under the plan ordered by this court, have projected student bodies

which are desegregated except possibly Cherry Street. And the excess assignments to black schools are relieved except for Cherry Street and Lincoln, where the excess is sharply reduced.

We recognize the difficulties of eliminating a dual system of schools in an urban area where Negro and white residents are concentrated in different and long-existent housing areas. But to say that compliance with the constitutional requirements is difficult is not to say that the difficulties cannot be solved. We are fully aware that the Board, with expertise and knowledge of local conditions, may be able to develop a different plan which effectively desegregates the Ward 3 schools, or to make adjustments in what we order, and thereby eliminate disadvantages that are present, and offer advantages that are absent, in what we direct. The Board is free to devise a different plan, or to seek changes and adjustments, and the District Court has discretion to approve such alternatives, provided that no such different plan or adjustment diminishes the extent of desegregation projected by this opinion, and, provided further, that the plan ordered by this court, unless modified by the District Court within the above limitations, must be put into effect when the schools open for the 1970–71 term.

The mandate shall issue immediately and no stay will be granted for filing petition for rehearing or petition for writ of certiorari.

This cause is remanded to the District Court for proceedings not inconsistent with this opinion.

Affirmed in part, reversed in part, remanded with directions.

APPENDIX A
WARD 3 SCHOOLS
PROJECTED ENROLLMENT FOR 1970-71
UNDER PLAN APPROVED BY DISTRICT COURT

| Zone No.* | School | Grades | Wh. | Bl | % Bl. | Total | Cap.** |
|---|---|---|---|---|---|---|---|
| E-16 | Barbe | 1-6 | 390 | 58 | -0- | 448 | 390 |
| H-3 | Boston | 9-12 | 161 | 517 | 76% | 678 | 800 |
| E-20 | Brentwood | 1-6 | 391 | 0 | -0- | 391 | 540 |
| E-6 & | Carver/ | K, 4-8 | | | | | |

8. This is a matter in which the biracial committee might be of particular assistance.

## APPENDIX A
### WARD 3 SCHOOLS
### PROJECTED ENROLLMENT FOR 1970-71
### UNDER PLAN APPROVED BY DISTRICT COURT

| Zone No.* | School | Grades | Wh. | Bl. | Bl. | Total | Cap.** |
|---|---|---|---|---|---|---|---|
| J-5 | Fisherville | 1-3 | 171 | 331 | 66% | 502 | 600 |
| E-8 | Central | K-6 | 222 | 82 | 27% | 304 | 630 |
| E-4 | Cherry Street | 1-6 | 6 | 873 | 99% | 879 | 540 |
| E-18 | College Oaks | 1-6 | 441 | 0 | -0- | 441 | 570 |
| E-14 | Cooley | 1-6 | 367 | 23 | 6% | 390 | 450 |
| E-23 | Dolby | 1-6 | 531 | 0 | -0- | 531 | 540 |
| E-5 | Eastwood | 1-6 | 277 | 109 | 28% | 386 | 630 |
| E-15 | Fourth Ward | 1-6 | 136 | 0 | -0- | 136 | 180 |
| E-21 | Greinwich/ Fairview | 1-6 | 518 | 130 | 20% | 648 | 930 |
| E-9 | Hamilton | 1-6 | 304 | 3 | 1% | 307 | 540 |
| E-19 | Henry Heights | 1-6 | 404 | 0 | -0- | 404 | 540 |
| E-25 | Kaufman | 1-6 | 302 | 37 | 11% | 339 | 390 |
| E-11 | Kennedy | 1-6 | 292 | 272 | 48% | 564 | 300 |
| J-8 | LaGrange/ Welsh Jr. | 7-9 | 1379 | 65 | 5% | 1444 | 1800 |
| H-5 | LaGrange Sr. | 10-12 | 2069 | 61 | 3% | 2130 | 1800 |
| H-4 | Lake Charles High | 10-12 | 771 | 80 | 9% | 851 | 1200 |
| E-2 & J-1 J-4 & | Lincoln | 1-8 | 223 | 1409 | 86% | 1632 | 990 |
| H-1 | Marion | 7-12 | 299 | 416 | 58% | 715 | 600 |
| E-7 | Mill Street | 1-6 | 8 | 492 | 98% | 500 | 750 |
| E-24 | Nelson | 1-6 | 207 | 0 | -0- | 207 | 420 |
| E-13 | Oak Park Elem. | 1-6 | 561 | 0 | -0- | 561 | 600 |
| J-9 | Oak Park. Jr. | 7-9 | 652 | 72 | 10% | 724 | 720 |
| E-3 | Opelousas/ Jackson | 1-6 | 17 | 706 | 98% | 723 | 1230 |
| E-17 | Prien Lake/ St. John | K-6 | 650 | 54 | 8% | 704 | 1050 |
| J-2 | Reynaud Jr. | 7-8 | 38 | 228 | 86% | 266 | 480 |
| E-1 | Riverside Elem. | K-6 | 178 | 341 | 66% | 519 | 540 |
| E-10 | Rosteet Elem. | 1-6 | 249 | 32 | 11% | 281 | 720 |
| J-6 J-3 & | Rosteet Jr. | 7-9 | 278 | 102 | 27% | 380 | 480 |
| H-2 | Washington High | 7-12 | 38 | 1454 | 97% | 1492 | 1590 |
| E-12 | Watkins Elem. | 1-6 | 343 | 27 | 7% | 370 | 390 |
| J-7 | Watson Jr. | 7-9 | 410 | 27 | 6% | 437 | 620 |
| E-22 | White | 1-9 | 1020 | 17 | 2% | 1037 | 990 |
| | TOTALS | | 14303 | 8018 | | 22321 | |

*Elementary zones are preceded by the letter E, junior high zones by J, and senior high zones by H
**This includes, in a few instances, portable classrooms.

[A3002]

## APPENDIX B
### WARD 3 SCHOOLS
### PROJECTED ENROLLMENT FOR 1970-71, AFTER ADJUSTMENTS

| Zone No.* | School | Grades | Wh. | Bl. | Bl. | Total | Cap.** |
|---|---|---|---|---|---|---|---|
| H-3 | Boston | 9-12 | 235 | 495 | 68% | 730 | 800 |
| E-6 | Carver/ Fisherville | 1-6 | 146 | 281 | 66% | 427 | 600 |
| E-8 | Central | 1-6 | 156 | 310 | 67% | 466 | 630 |
| E-4 | Cherry Street | 1-6 | 66 | 533 | 89% | 599 | 540 |
| E-5 | Eastwood | 1-6 | 277 | 309 | 53% | 586 | 630 |
| E-21 | Greinwich/ Fairview | 1-6 | 587 | 156 | 21% | 743 | 930 |
| E-9 | Hamilton | 1-6 | 231 | 203 | 47% | 434 | 540 |
| E-11 | Kennedy | 1-6 | 63 | 237 | 79% | 300 | 300 |
| H-4 | Lake Charles | 10-12 | 718 | 217 | 23% | 935 | 1200 |
| E-2 & J-1 | Lincoln | 1-8 | 223 | 809 | 78% | 1032 | 990 |
| H-1 | Marion | 9-12 | 85 | 333 | 80% | 418 | 600 |
| E-7 | Mill Street | 1-6 | 121 | 492 | 80% | 613 | 750 |
| E-3 | Opelousas/ Jackson | 1-6 | 107 | 778 | 83% | 885 | 1230 |
| J-2 | Reynaud Jr. | 7-8 | 105 | 233 | 69% | 338 | 480 |
| E-1 | Riverside Elem. | 1-6 | 118 | 341 | 74% | 459 | 540 |
| E-10 | Rosteet Elem. | 1-6 | 345 | 281 | 45% | 626 | 720 |
| J-6 J-3 & | Rosteet Jr. | 7-9 | 226 | 102 | 31% | 328 | 480 |
| H-2 | Washington High | 7-12 | 317 | 1261 | 80% | 1578 | 1590 |
| J-7 | Watson Jr. | 7-9 | 334 | 233 | 41% | 567 | 620 |

*Elementary zones are preceded by the letter E, junior high zones by J, and senior high zones by H.
**This includes, in a few instances, portable classrooms.

[A3001]