**Virgie Lee VALLEY et al., Appellants,**

v.

**RAPIDES PARISH SCHOOL BOARD
et al., Appellees.**

No. 30099.

United States Court of Appeals,
Fifth Circuit.

Aug. 25, 1970.

Norman J. Chachkin, Margrett Ford, Jack Greenberg, New York City, Louis Berry, Alexandria, La., Jerris Leonard, Asst. Atty. Gen., Civil Rights Div., U. S. Dept. of Justice, Washington, D. C., Donald E. Walter, U. S. Atty., Western District of La., Shreveport, La., A. P. Tureaud, New Orleans, La., David L. Norman, Deputy Asst. Atty. Gen., Edward S. Christenbury, Atty., U. S. Dept. of Justice, Washington, D. C., for appellants.

Edwin O. Ware, Dist. Atty., 9th Judicial District, Rapides Parish, Gus Voltz, Jr., Asst. Dist. Atty., Courthouse, Alexandria, La., Jack P. F. Gremillion, Atty. Gen. of La., Capitol Building, Baton Rouge, La., for appellees.

Before JOHN R. BROWN, Chief Judge, MORGAN and INGRAHAM, Circuit Judges.

LEWIS R. MORGAN, Circuit Judge:

The issue in this school desegregation case is whether Wards 1 and 8 of the Rapides Parish Louisiana school system presently operate on a unitary basis within the requirements set forth in Alexander v. Holmes County Board of Education, 1969, 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19, and Green v. County School Board of New Kent County, 1968, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716. Since the school system is challenged only as to one of the six elements [1] required by Green, supra, for the establishment of a unitary system, we will follow the approach of Andrews v. City of Monroe, 5 Cir., 1970, 425 F.2d 1017, and deal exclusively with the question of pupil assignment.

Those sections of the district court's order (Appendix "A") which do not concern either student assignment in Wards 1 and 8 or the majority-to-minority transfer policy are hereby affirmed.

STUDENT ASSIGNMENT

On April 13, 1970, the district court conducted a hearing and considered three separate plans for desegregating the schools within Wards 1 and 8: the plan of the Rapides Parish School Board; a plan filed by the Department of Health, Education and Welfare (HEW); and an additional plan submitted by the United States Department of Justice at the request of the district court which actually modified the original HEW arrangement. By final order entered on June 8, 1970, the court rejected all three plans by substituting a plan of its own.

The City of Alexandria, comprising most of Wards 1 and 8, maintains a total of 24 schools (17 elementary, 4 junior high, and 3 senior high schools) which serve some 15,639 pupils. Transportation to these schools is accomplished by 47 buses on which 43% of the student population ride daily. Negroes account for 47% of the total student body.

Because of the residential dichotomy between Alexandria's black and white citizens, the so-called "neighborhood school plan" adopted by the district court, although admittedly impartial as to race, still leaves 60% of the black students in schools where their race is an approximate 90% or greater majority. Of the 24 schools, seven remain predominantly Negro.

The end result is that neighborhood zoning in Alexandria, Louisiana, leaves the majority of the city's Negro students in a virtually segregated school system. The fact that the plan complies with the requirements for a neighborhood system as enunciated by this court in Ellis v. Board of Public Instruction of Orange County, Florida, 5 Cir., 1970, 423 F.2d 203, does not make the system constitutionally palatable unless the plan actually works to achieve integration. Green v. County School Board of New Kent County, supra; United States v.

---

1. The six prerequisites the school must establish in order to achieve a unitary system under Green v. County School Board of New Kent County, supra, are desegregation of faculty, staff, transportation, facilities, extracurricular activities, and student assignment.

Indianola Municipal Separate School District, 5 Cir., 1969, 410 F.2d 626. As this court stated previously in Andrews v. City of Monroe, 5 Cir., 1970, 425 F.2d 1017:

> However we do not reject the School Board's plan solely on the ground that it does not fit the *Orange County* definition of a neighborhood system. *Even if, as presently constituted the plan were a true neighborhood plan we would reject it because if fails. to establish a unitary system. Orange County* does not say that a "neighborhood" system of student assignment per se is a unitary system. (Emphasis added.) 425 F.2d 1019.

■ Thus, having an affirmative duty to abolish segregation, the school board must bring about a unitary system. *Indianola Separate School. District,* supra. The type plan employed, be it neighborhood zoning or otherwise, is of little consequence in view of the constitutionally required result that public schools be conducted on a unitary basis. The district court's plan does not substantially abolish segregation in Wards 1 and 8, and for this reason it cannot be upheld on the ground that it is a true neighborhood plan within the meaning of *Orange County.*

■ By pairing or clustering the schools in Wards 1 and 8, the number of Negro children attending all black schools can be substantially reduced. However, following the approach of Pate v. Dade County School Board, 5 Cir., 1970, 434 F.2d 1151 the district court has the alternative of either enforcing the plan contained in this opinion or approving any other arrangement submitted by the school board, or other interested parties, provided, of course, that the alternate plan achieves substantially the same results as reached by this court's modifications. In the absence of such a plan by the school board or other interested parties, it is directed that the plan outlined below be effectuated.

## Elementary Schools

Using the neighborhood zones approved by the district court, the boundary of Rugg Elementary (284 whites, 116 blacks) is contiguous with that of the zone containing both South Alexandria Primary (37 whites, 370 blacks) and South Alexandria Elementary (28 whites, 597 blacks). All three school buildings are within one mile [2] of each other so that no child within either zone is more than one and one-half miles distant from any of the buildings. It is therefore ordered that Rugg be grouped with South Alexandria Primary and Elementary creating a new school zone with a student population of 349 whites and 1,083 blacks.

The Reed Elementary zone (69 whites, 137 blacks) is bounded to the west by Rosenthal Elementary (375 whites, 139 blacks) and adjoined in the northeast by Peabody Elementary (3 whites, 533 blacks). The three school buildings are less than two miles apart and are located within two miles of the homes of most children in the three zones. Since these school buildings are in such close proximity to each other and also to the students they will serve they should be combined to form a new school zone which will have a racial composition of 447 whites and 809 blacks.

In the eastern quadrant of Alexandria three zones lie side by side: Lincoln Road Elementary (0 whites, 585 blacks) abuts Lafargue (172 whites, 391 blacks) which joins Martin Park (431 whites, 25 blacks). As in the zone previously created these three school buildings are also no more than two miles apart with the farthest child being slightly in excess of two miles from the most remote building. We thus direct that Lincoln Road Elementary, La Fargue, and Martin Park be grouped to form one school zone. The new zone would be attended by 502 whites and 1,001 blacks.

---

2. Distance is not stated on the basis of street travel but computed in terms of air miles or "as the crow flies".

*Junior High Schools*

Of the four junior high schools only one (Jones Street) is predominantly Negro under the plan formulated by the district court. All the schools are located within close proximity to one another— the farthest distance between any two schools being two and one-half miles. By redrawing the zones as recommended in the HEW-Justice Department plan,[3] all the junior high students would receive an integrated education. With the new plan the racial composition of each school would thus become: Alexandria Junior High School—286 whites, 56 blacks; Jones Street Junior High School—439 whites, 679 blacks; Lincoln Road Junior High School—175 whites, 393 blacks; S. M. Brame Junior High School—603 whites, 354 blacks.

It is therefore directed that the zones contained in the HEW-Justice Department plan for junior high schools be implemented by the district court.

*Senior High Schools*

There are three senior high schools in Wards 1 and 8 and, under the zones approved by the district court, the one predominantly black high school (Peabody) contains 62% of the Negro senior high students. Peabody is located within one and one-quarter miles of Bolton High School and less than four miles from the predominantly white Alexandria High School.

The combined HEW-Justice Department plan successfully integrates the three senior high schools, resulting in the following racial composition for each school: Bolton Senior High School—702 whites, 475 blacks; Alexandria Senior High School—1,199 whites, 620 blacks; Peabody Senior High School, 535 whites, 1,019 blacks.

It is thus ordered that the district court implement the zones for senior high schools as outlined in the plan submitted by the United States Department of Justice and HEW.

MAJORITY-TO-MINORITY
TRANSFER POLICY

The order of the district court provides that a student attending. a school in which his race is in the majority may choose to attend another school in which his race is in the minority "where space is available". In accord with our recent decisions,[4] the transferees are to be given priority for space as provided for in Allen v. Board of Public Instruction of Broward County, Florida, 5 Cir., 1970, 432 F.2d 362 [No. 30,-032].

DEFICIENCIES TO BE
REMEDIED

We conclude that the desegregation plan for Wards 1 and 8 of Rapides Parish as approved by the district court fails to meet one of the six requirements necessary for a valid unitary school system under the *Green* mandate. The district court must implement the school plan heretofore stated in this opinion for the 1970–1971 school year; or, alternatively, the district court may in its discretion adopt modifications submitted by the school board provided these modifications can be accomplished for the 1970–1971 school year and provided also that they result in at least the same degree

---

3. Enrollment figures for the junior and senior high schools are based on projected attendance for the 1970–71 school year as compiled by local school officials in conjunction with the United States Department of Justice and submitted by letter from the Department on August 14, 1970.

4. Hightower v. West, 5 Cir., 1970, 430 F.2d 552; Carr v. Montgomery County Board of Education, 5 Cir., 1970, 429 F.2d 382; Davis v. Board of School Commissioners of Mobile County, 5 Cir. 1970, 430 F.2d 883; Singleton v. Jackson Municipal Separate School District, 5 Cir., 1970, 426 F.2d 1364.

of desegregation as that required by this court. The district court and the school board are under a duty to maintain a unitary system by continually evaluating the system and making adjustments to recent developments limited, of course, by the guidelines previously indicated.

The majority-to-minority transfer provision must be amended as outlined above.

Except as to the modifications set forth above, the order of the district court is approved.

Affirmed in part; reversed in part.

## APPENDIX A

### IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF LOUISIANA

### ALEXANDRIA DIVISION

CIVIL ACTION No. 10,946

VIRGIE LEE VALLEY, ET AL,
                                    Plaintiff,
UNITED STATES OF AMERICA,
                                    Plaintiff-Intervenor,

versus

RAPIDES PARISH SCHOOL BOARD, ET AL,
                                    Defendants.

Filed: Jun. 8, 1970

FOR PLAINTIFFS

Messrs.
Louis Berry
1406 Ninth Street
Alexandria, Louisiana

Miss Margrett Ford
Suite 2030, 10 Columbus Circle
New York, New York

FOR PLAINTIFF-INTERVENOR

Edward S. Christenbury and
Jerris Leonard
Civil Rights Division
United States Department of Justice
Washington, D. C. 20530

FOR DEFENDANTS

Edwin O. Ware, III, District Attorney
Rapides Parish Court House
Alexandria, Louisiana

HUNTER, Judge:

The *Green* phase of this litigation commenced in the summer of 1969 upon the motions of both the United States and the private plaintiffs seeking another method of pupil assignment in Rapides Parish other than the then existing "freedom of choice." After hearings on this motion and a subsequent appeal, this case was remanded to this Court in the consolidated school appeals captioned Hall v. St. Helena Parish School Board, 417 F.2d 801 (5th Cir. 1969) for further hearings. Prior to these hearings, both the Office of Education, United States Department of Health, Education and Welfare (HEW) and the School Board filed with this Court on July 5, 1969 alternate plans of student assignment for Rapides Parish. At the conclusion of hearings on these two plans, this Court on July 24, 1969 entered an order adopting the plan of desegregation submitted by the Rapides Parish School Board. It had been anticipated that this would be a two-year plan. However, on appeal, the Court of Appeals found that the School Board's plan "does not establish a * . * unitary school system." Valley v. Rapides Parish School Board, 422 F.2d 814 (5th Cir. January 7, 1970) and remanded the case to this Court for compliance with the decision in Singleton v. Jackson Municipal Separate School District, 419 F.2d 1211 (5th Cir. 1969) and Carter v. West Feliciana Parish School Board, 396 U.S. 290, 90 S.Ct. 608, 24 L.Ed.2d 477 (1970). This Court then entered an order requiring the School Board to comply with the Fifth Circuit's decision of January 7, 1970. This Court also requested that the Justice Department submit modifications to the HEW plan filed July 5, 1969. By letter to this Court dated January 15, 1970, the Department of Justice, on the advice of educational experts from HEW set forth minor modifications to the previously filed HEW plan.

On January 15, 1970, the School Board submitted a plan calling for application of the same formula to student integration as the Fifth Circuit, in *Singleton*, applied to faculty integration. This plan would have brought about a unitary system. Time was of the essence and we promptly approved the plan with the admonition that as many of the permanent physical plants as possible be used, and with the suggestion that the Board secure the help and advice of a representative group of its local black people with whom the Board could confer concerning transition. Subsequently, on January 29th the School Board determined that they could neither financially nor physically implement the January 15th plan, so they presented another plan. This plan made only minor changes in pupil assignments, but due to the fact that only two days remained before the deadline of February 1st, we acceded to the judgment of the School Board and ordered the plan put into effect forthwith, along with the teacher provisions of *Singleton*. We did not approve this plan as a unitary system, but said: "Put the plans in effect and argue later." The Court believed it a necessity to have the *Singleton* teacher ratio effectuated in order to stabilize any later zones which might be established. Throughout this three-week period we were endeavoring to bring some stability to the System, and at the same time have the teacher provision of *Singleton* put into effect, and our decision in each instance was to put the plan in effect and argue about student desegregation later. A formal and complete hearing was held on April 13th. The Court concludes that the plan presented by the Board at the hearing does not convert the Rapides Parish School System to a unitary one within the meanings of the Supreme Court decisions in Alexander v. Holmes County, 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19; Green v. County School Board of New Kent County, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed. 2d 716; and the decision of the Fifth Circuit in Ellis v. Orange County (1970).

The criteria used by the Board in establishing their zone lines—considering man-made and natural boundaries, and the testimony of the school people that the Board considered "railways and the

freeway system on McArthur Drive" (Tr. 13)—precludes that plan from coming within the purview of a true "neighborhood system", as defined in Ellis v. Board of Public Instruction of Orange County, Florida, 423 F.2d 203 (5th Cir. 1970). In that decision the Court said:

> "[T]he neighborhood system, based on school capacity, must be observed without exception. This will prevent any variance based on traffic conditions * * * or by zone line locations * * *. *Variances by arbitrary zone lines, or for reasons of traffic, while reasonable on their face, may destroy the integrity and the stability of the entire assignment plan.* If Orange County wishes to maintain a neighborhood assignment system, then it must do so without variances. *Each student in the system must be assigned to attend the school nearest his or her home, limited only by the capacity of the school, and then to the next nearest school.* Id. at p. 207 (Emphasis added.)

In a parallel case involving the City of Monroe, Louisiana, attendance zone lines based upon the *same* criteria as those used in Alexandria and producing similar results were held unacceptable by the Court of Appeals. In that case the Court stated that "[w]hile such a system of student assignment may be less offensive than one which intentionally segregates students, it does not necessarily follow that it creates a unitary system". Andrews v. City of Monroe et al., 425 F.2d 1017 (5th Circuit, April 23, 1970). "The Supreme Court has made it clear that school boards cannot avoid their responsibility to create a unitary system simply by resorting to non-discriminatory geographical zoning where such zoning would be ineffective." Andrews v. City of Monroe et al., supra.[1]

In *Green* (supra), the mechanics of what must be done to bring about a unitary system were detailed. They were sttaed in terms of eliminating the racial identification of the schools in six particulars: composition of student bodies, faculty, staff, transportation, extra-curricular activities, and facilities. 391 U.S. at 435, 88 S.Ct. 1689. Tested in this frame of reference, we conclude that the Rapides School System (Singleton now is in effect) falls short of being a unitary one only as to the composition of student bodies. The Court of Appeals has already reached a similar conclusion as to similar zones, and under their directive the present zones cannot pass constitutional muster.[2]

Under the total circumstances, we repeat for 1970–71 school year the pertinent provisions of *Singleton* relating to faculty, staff, transportation, extra-curricular activities, facilities and transfer. Accordingly, it is ordered that the School Board shall announce and continue to implement for 1970–71 the following policies:

### DESEGREGATION OF FACULTY AND OTHER STAFF

1. For the 1970–71 school year, the principals, teachers, teacher-aides and other staff who work directly with children at a school shall be so assigned that in no case will the racial composition of a staff indicate that a school is intended for Negro students or white students. The district shall assign the staff described above so that the ratio of Negro

---

1. "In view of the situation found in New Kent County, where there is no residential segregation, the elimination of the dual school system and the establishment of a 'unitary, non-racial system' could be readily achieved with a minimum of administrative difficulty by means of geographic zoning * * *. [However] a geographical formula is not universally appropriate * * *. Green v. County School Board of New Kent County, 1968, 391 U.S. 430, 442 n. 6, 88 S.Ct. 1689, 20 L.Ed.2d 716, (quoting from Bowman v. County School Board, 4th Cir., 1967, 382 F.2d 326, concurring opinion).

2. These zones appear on three large maps in the record which are marked "April 13", "A", "B" and "C".

to white teachers in each school, and the ratio of other staff in each, are substantially the same as each such ratio is to the teachers and other staff, respectively, in the entire school system.

The school district shall, to the extent necessary to carry out this desegregation plan, direct members of its staff as a condition of continued employment to accept new assignments.

2. Thereafter, staff members who work directly with children, and professional staff who work on the administrative level will be hired, assigned, promoted, paid, demoted, dismissed, and otherwise treated without regard to race, color, or national origin.

3. If there is to be a reduction in the number of principals, teachers, teacher-aides, or other professional staff employed by the school district which will result in a dismissal or demotion of any such staff members, the staff member to be dismissed or demoted must be selected on the basis of objective and reasonable non-discriminatory standards from among all the staff of the school district. In addition if there is any such dismissal or demotion, no staff vacancy may be filled through recruitment of a person of a race, color, or national origin different from that of the individual dismissed or demoted, until each displaced staff member who is qualified has had an opportunity to fill the vacancy and has failed to accept an offer to do so.

Prior to such a reduction, the school board will develop or require the development of non-racial objective criteria to be used in selecting the staff member who is to be dismissed or demoted. These criteria shall be available for public inspection and shall be retained by the school district. The school district also shall record and preserve the evaluation of staff members under the criteria. Such evaluation shall be made available upon request to the dismissed or demoted employee.

"Demotion" as used above includes any re-assignment (1) under which the staff member receives less pay or has less re-sponsibility than under the assignment he held previously, (2) which requires a lesser degree of skill than did the assignment he held previously, or (3) under which the staff member is asked to teach a subject or grade other than one for which he is certified or for which he has had substantial experience within a reasonably current period. In general and depending upon the subject matter involved, five years is such a reasonable period.

### MAJORITY TO MINORITY TRANSFER POLICY

The school district shall permit a student attending a school in which his race is in the majority to choose to attend another school, where space is available, and where his race is in the minority. The Orange County, 423 F.2d 203 (5th Cir., 1970) conditions shall be applicable concerning transportation, etc.

### TRANSPORTATION

The transportation system, in those school districts having transportation systems, shall be completely re-examined regularly by the superintendent, his staff, and the school board. Bus routes and the assignment of students to buses will be designed to insure the transportation of all eligible pupils on a non-segregated and otherwise non-discriminatory basis.

### SCHOOL CONSTRUCTION AND SITE SELECTION

All school construction, school consolidation, and site selection (including the location of any temporary classrooms) in the system shall be done in a manner which will prevent the recurrence of the dual school structure once this desegregation plan is implemented.

### ATTENDANCE OUTSIDE SYSTEM OF RESIDENCE

If the school district grants transfers to students living in the district for their attendance at public schools outside the district, or if it permits trans-

fers into the district of students who live outside the district, it shall do so on a non-discriminatory basis, except that it shall not consent to transfers where the cumulative effect will reduce desegregation in either district or reinforce the dual school system.

### BI-RACIAL COMMITTEE

Pursuant to the pattern of Fifth Circuit decisions in *Ellis,* supra, and *Singleton,* 426 F.2d 1364 (1970), a bi-racial committee is to be named and is to function as a tool to carry out the plan and insure a unitary system. The membership is to be divided equally between whites and blacks. (See Judge Brown's Order in *Singleton,* supra).

### STUDENT ASSIGNMENT PLANS

All agree that Wards 2, 5, 6, 7, 9, 10 and 11 now operate as unitary systems. Wards 1 and 8 constitute the City of Alexandria. Several of the schools are deep within black neighborhoods but others are on fringe areas. It is projected that there will be, roughly, 8,200 white children and 7,400 black children in Wards 1 and 8 for the 1970–71 year. Previously, there were eight all-black schools, but no all-white schools. It is apparent that the lines were drawn to place as many black children as possible in white schools and to exclude as many white children as possible from black schools. This cannot be accepted. It has already been rejected.

Segregation has been legally a corpse for sixteen years. "In the typical dual system in operation prior to Brown I and II, the student was assigned to attend the school nearest his or her home. This so-called neighborhood assignment system was designed to eliminate transportation costs and permit the student to

remain as near home as possible. Under the dual system as ruled unconstitutional, a Negro student would be assigned to the nearest Negro school to his or her home and a white student would be assigned to the nearest white school." (See Ellis v. Orange County, supra). Under a neighborhood assignment basis in a unitary system, the child is to attend the nearest school whether it be a formerly white school or black school. Rapides' approach in its April 13th zones is not acceptable for reasons heretofore stated. We shall endeavor to formulate a plan which will bring about results required without burying the public schools by the use of unreasonable requirements for both black and white. This can be done in keeping with the personal dignity of all citizens, of whatever race.

At our request the School Board has redrawn its zones so that each student is assigned to attend the nearest school to his or her home, limited only by the capacity of the school.[3] This is the Court's basic plan. It meets the requirements of Orange County. However, we would be ostriches with our heads buried in the sand if we did not take cognizance of the language used by some Fifth Circuit panels which articulate constitutional standards in mechanical terms of arithmetic. Accordingly, in addition to the basic neighborhood plan (as the crow flies), we take additional steps in furtherance of the principle that we are in an area where it is not spirit but bodies that count. First, in accordance with the suggestion of the individual plaintiffs, Aaron Street School is to be closed, and Lafargue reopened. This closes an all-black school which cannot, in the Court's opinion, be integrated, and opens a formerly all-black school in a fringe area on an integrated basis.[4] Secondly, the black children previously assigned under 1969

3. These zones appear on map marked "Overlay 1" and "Overlay 2" for elementary and junior high grades. "April 13 (C)" portrays the high school zones. There are two overcrowded elementary schools, both are predominantly white; the black children in the area are assigned to these predominantly white schools by preference and the extra white children attend the next available school.

4. See Response to Desegregation Plans, filed by School Board and HEW, filed by Legal Defense Fund on July 18, 1969. Record, Page 19.

school board zones in Rosenthal, Rugg, Alexandria Junior High, S. M. Brame Junior High and Aiken Elementary are re-assigned to those schools.[5]

The following chart reveals the projected breakdown as to each school in Wards 1 and 8:

| Elementary Schools | White | Black |
|---|---|---|
| Acadian | 140 | 259 |
| Cherokee | 542 | 48 |
| D. F. Huddle | 402 | 57 |
| E. S. Aiken | 257 | 125 |
| Horseshoe Drive | 291 | 30 |
| J. B. Lafargue | 172 | 391 |
| J. B. Nachman | 615 | 52 |
| L. S. Rugg | 284 | 116 |
| Lincoln Road | 0 | 585 |
| Martin Park | 431 | 25 |
| North Rapides | 548 | 32 |
| Peabody | 3 | 533 |
| Reed Avenue | 69 | 137 |
| Rosenthal | 375 | 139 |
| Silver City | 0 | 634 |
| South Alexandria (Elem.) | 28 | 597 |
| South Alexandria (Primary) | 37 | 370 |
| **Junior High Schools** | | |
| Alexandria Junior | 659 | 273 |
| Jones Street | 62 | 516 |
| Lincoln Road | 181 | 327 |
| S. M. Brame | 698 | 205 |
| **Senior High Schools** | | |
| Alexandria | 1,285 | 206 |
| Bolton | 1,125 | 538 |
| Peabody | 40 | 1,200 |

### Ward 3

*Cheneyville Elementary*—Will contain Grades K–6; Grades K and 1 for white and black pupils.

*Lincoln Williams Elementary*—Will contain Grades 2–8; Grades 7 and 8 for white and black pupils.

*LeCompte Elementary*—Will contain Grades K–6; Grades K and 1 for white and black pupils.

*Carter C. Raymond High*—Will contain Grades 2–12; Grades 7 and 8 for white and black pupils.

*Rapides High*—Grades 9–12 for black pupils from Cheneyville and Forest Hill areas.[6]

5. These children attended these *nearby* predominantly white schools in 1969–70 school year. No additional busing is involved. It promotes integration. Valley v. Rapides Parish, 5th Cir., 1970, 422 F.2d 814.

The following chart presents the projected breakdown by race in each school:

| School | White | Black |
|---|---|---|
| Cheneyville Elementary | 72 | 57 |
| LeCompte Elementary | 290 | 85 |
| Rapides High | 323 | 97 |
| Carter C. Raymond High | 98 | 474 |
| L. Williams Elementary | 24 | 187 |

### Ward 4

Southwest Rapides Elementary would be closed, transferring approximately 130 pupils to Glenmora Elementary and 52 pupils to Forest Hill Elementary, the closest schools to their homes. High School pupils from the Consolidated Bonding District, approximately nine white and 18 black students would be transferred to Rapides High.

The following chart reveals the projected breakdown by race in each school:

| School | White | Black |
|---|---|---|
| Glenmora High | 151 | 38 |
| Glenmora Elementary | 408 | 192 |
| Forest Hill Elementary | 301 | 65 |

### Ward 7

Boyce and Wettermark are paired. The breakdown projection by race is as follows:

| School | White | Black |
|---|---|---|
| Boyce High | 407 | 344 |
| A. Wettermark High | 228 | 159 |

The student assignment plans herein set forth for Wards 1, 3, 4, 7 and 8, combined with those presently in effect in the other wards, convert the Rapides system into a unitary one "within which no person is effectively excluded from any school because of race. Alexander v. Holmes County, 396 U.S. 19 [90 S.Ct. 29, 24 L.Ed.2d 19]." No one is denied the right to an integrated education. If a student is assigned to a school where his race is in a majority, all that student has to do is merely request a transfer to any school in which his race is in a minority.

6. The Cheneyville and Lincoln Williams plan is the one presented and approved by Mr. Ambrose Jackson, President, Concerned Black Citizens of Cheneyville.

It is projected that there will be 10,000 black students in the Rapides Parish School System in the 1970–71 school year. There are no all-white schools in these wards. The National Observer of January 26, 1969, contains a chart entitled "Racial Isolation in Public Schools." The quoted source is HEW. The figures are for 1968–69. These figures reveal the extent of "de facto" segregation in both North and South:

| City | Negro % of Total Students | % Negroes in Majority White Schools | % Negroes in 95–100% Negro Schools |
|---|---|---|---|
| D.C. | 93.5 | 0.9 | 89.2 |
| Chicago | 52.9 | 3.2 | 85.4 |
| Los Angeles | 22.6 | 4.7 | 78.5 |
| New York City | 31.5 | 19.7 | 43.9 |
| *Houston | 33.3 | 5.3 | 86.4 |
| Baltimore | 65.1 | 7.7 | 75.8 |
| Dallas | 30.8 | 2.1 | 82.2 |
| Philadelphia | 58.8 | 9.6 | 59.8 |
| Indianapolis | 33.7 | 22.4 | 52.9 |
| Boston | 27.1 | 23.3 | 33.6 |
| Pittsburgh | 39.2 | 21.3 | 42.7 |
| Kansas City, Mo. | 46.8 | 14.0 | 67.3 |
| Buffalo | 36.6 | 27.0 | 61.1 |
| Oklahoma City | 21.8 | 12.5 | 79.7 |
| St. Louis | 63.5 | 7.1 | 86.2 |
| Atlanta | 61.7 | 5.4 | 90.0 |
| Orleans Par, La. (New Orleans) | 67.1 | 8.8 | 81.2 |
| Newark | 72.5 | 2.1 | 75.8 |
| Gary, Inc. | 61.6 | 3.1 | 80.8 |
| Rochester, N. Y. | 28.9 | 45.6 | 12.1 |
| Fresno, Calif. | 9.0 | 15.8 | 72.5 |
| Omaha, Neb. | 18.1 | 20.5 | 38.3 |

The overall figure in Rapides will reveal that in excess of 85% of all students will be going to integrated schools. Two schools will be all-black and one will be virtually so. Approximately 85% of the black students will be attending schools with integrated faculties and student bodies.

## ALTERNATE PLAN

The number of all-black schools can quickly be reduced frm three to one by pairing four schools which are in the immediate proximity of each other. This could be done without any additional busing. It would require Silver City to be paired with Acadian, and Lafargue to be paired with Lincoln Road Elementary. In my judgment, this pairing should not take place. In the first place, it is seriously doubted that any of the affected people, black or white, would be in favor of it. Secondly, it would do nothing to stabilize the situation in these schools. The contrary would probably be true. But, such pairing would result in reducing the percentage of black children attending all-black schools from 17.5% to 5.33%, and would reduce the percentage of those attending 95% or more black schools from 35% to 23%. These percentages, of course, would be further reduced by the utilization of majority-to-minority transfers.

## HEW-JUSTICE PLANS

Justice and HEW plans for the senior and junior high schools are identical. First, we consider the high schools.

HEW has drawn lines to create zones for the purpose of bringing about racial balance in each school with proximity relegated to the background. *Bolton* will not be appreciably affected. Some 700 black students would be transferred from *Peabody* to some other school. Most of these students live in the general vicinity of Peabody; 272 would be bused four or five miles to Alexandria High. Thirty-seven (37) would be added to Bolton. Somewhere in the shuffle, 400 of these black students have been lost. One thing made crystal clear to me is that the black community does not want to lose Peabody's identity. They are proud of it and I believe the shifting of 700 black students from that school would result in bitter resentment in the black community. These children would, in effect, be denied their right to go to Peabody because of race. Once they were gerrymandered into Alexandria High they would be in a minority status and would have to remain there. The majority-to-

---

* This situation will be drastically changed in Houston in September, 1970, under an "Equi-distant Zoning Plan of Racial In-

tegration" order which was entered by the Chief Judge of the Southern District of Texas on June 1, 1970.

minority transfer right they now have would not be available to them.

Some 285 whites will be taken from *Alexandria High* and bused to Peabody. In some instances this will be five or six miles "as the crow flies." Besides, these children are in the Alexandria High Bonding District. As a result, they would be bused out of the zone from the school which their parents have built and sent to another school.

## JUNIOR HIGH SCHOOLS

The same procedures are used for Junior Highs as for Senior. Children will be uprooted from their neighborhoods and transported to other neighborhoods. This will be equally true for black and white. The HEW-Justice figures for the junior high schools do not "jibe" with the figures given by the School Board for the zones which HEW defines. There is attached a projection of the racial make-up of these schools if the HEW plan were adopted. There is an immense discrepancy. For example, the HEW figures show that Alexandria Junior High would be composed of 285 whites and 270 blacks. The School Board figures—and we, too, have traced them on the zone maps—reveal that there will not be 270 black children in this school, but only 56. There can be no question that the Court's plan would bring about considerably more integration in this junior high school. The HEW figures for Lincoln Road Junior High project 237 blacks and 174 whites, whereas in reality, there would be 181 whites and 300 blacks. The Court appreciates that HEW was faced with an almost insurmountable time schedule in the summer of 1969 when these plans were prepared. Their task was a difficult one and all in all they did a commendable job, but it is obvious that the patent errors make it impossible to ascertain that the real racial composition would be under their plan for the junior and senior high schools.[6a]

## ELEMENTARY SCHOOLS

In the City of Alexandria there are 17 elementary schools. Under the HEW plan four elementary schools in the city would be zoned: Huddle, Cherokee, Nachman and North Bayou Rapides. Lefargue would remain closed and Aaron would remain open. The other elementary schools would be paired as follows:

1. Aiken would be paired with Peabody Elementary, which is approximately 2½ miles away. All distances here enumerated will be as the crow flies. In many instances the actual mileage necessary to get from one school to another would be doubled because of available routes. The pairing of this school would mean that these children would travel through two other zones and pass three other elementary schools (Rugg, South Alexandria Primary, and South Alexandria Elementary) which are closer to both schools, so that they could be paired one with the other.

2. Acadian would be paired with Silver City and Jones Street Junior High, which are approximately 1¼th miles from each other. This would mean pairing three schools, each of which is majority black. This, in my judgment, is neither realistic nor sensible.

3. Martin Park would be paired with Lincoln Road, which is approximately 1½ miles away. These schools are also separated by McArthur Drive, a dangerous, six-lane major highway.

4. Horseshoe would be paired with Aaron, which is 2½ "crow" miles away, and again this would involve crossing McArthur Drive. It should also be mentioned that Aaron can only be reached by traveling on a dirt road in what is one of the poorest sections of the city. The Court's plan would close Aaron and reopen in its place Lafargue which is in a fringe area.

6A. The Court has spoken with Government counsel, and the record will be supplemented to rectify numerical errors.

5. Rosenthal is to be paired with Reed. However, HEW later adopted the School Board's zone lines as to these two schools.

6. Rugg would be paired three ways, with South Alexandria Primary and South Alexandria Elementary.

The Justice Department plan for the elementary schools is probably more palatable than is the HEW plan, in that it proposes two modifications:

(a) Leave Peabody Elementary as K-6 instead of pairing it with Aiken, which is miles away. Concededly, this would leave an all-black school.

(b) Designate South Alexandria Primary and South Alexandria Elementary as a Grade 4-6 complex for students attending Aiken, Rugg and South Alexandria zones.

The basis, of course, of the HEW plan, is body count. Mr. Kendrick, the HEW educator who drew up the HEW plan, testified in the case that he and his assistant consulted the School Board maps and the population maps, and then proceeded to visit the schools. He says that he and his assistant spent three or four days on this case, along with other cases to which they were assigned. He was asked categorically what educational reason there was for pairing Acadian and Silver City, and he frankly admitted that the purpose was to maximize desegregation. It was pointed out that many people in the Acadian area were selling their homes and moving, and Mr. Kendrick readily conceded that if the people were actually moving out maybe it would not be in the best interest to pair these two schools.

There can be no question but that the HEW plan was hastily drawn. The zones suggested by HEW just do not contain the students enumerated in their body counts. There are 400 black students formerly in Peabody who apparently are not assigned anywhere. There are 280 blacks assigned to Alexandria Junior High, but a search of the map by the Court and a study of the matter by the School Board officials reveal only 56. We reiterate our appreciation of HEW's effort. They were given short notice and time was of the essence. But the plans are just not accurate.

With the diversity and multiplicity of decisions involving the subject, many questions haunt us each time another case of this nature arises. What does a school district have to do to convert to a unitary system? What is a unitary system? Is a plan drawn strictly along residential lines acceptable? What if we change attendance zones to desegregate two schools, and then either whites or blacks move to avoid desegregation? Must the lines be drawn again? How many times? Time and time again we have been confronted with these questions and have endeavored to decide the cases according to the law of the day, and then we move on to another case another day, with no real answers.

HEW's statistics reflect that in northern states, as well as southern, the black population is frequently concentrated in geographical areas and that as a result, many northern and southern schools in metropolitan areas serve predominantly only black students. The extent to which de facto segregation makes a system dual has not as yet been spelled out by the Supreme Court. The language in *Alexander* is in the form of a directive to the school board to operate—

"as unitary systems within which no person is to be effectively excluded from any school because of race or color."

Again, in *Northcross* v. Board of Education of the Memphis, Tenn., City Schools, 397 U.S. 232, 90 S.Ct. 891, 25 L.Ed.2d 246 (March, 1970), the Chief Justice wrote a special concurring opinion in which he used this pertinent language:

"The suggestion that the Court has not defined a unitary system is not supportable. In Alexander v. Holmes County Board of Education, 396 U.S.

19, 90 S.Ct. 29, 24 L.Ed.2d 19, (1969), we stated, perhaps too cryptically, that a unitary system is one within which no person is to be effectively excluded from any school because of race or color * * *."

Paraphrasing these two sentences, what the Chief Justice has said is that the Court *has* defined a unitary system, but that they have not made their definition clear. It is crystal clear that this is what the Chief Justice meant, because in the next sentence he used this language:

"From what is now before us in this case it is not clear what issues might be raised or developed on argument; as soon as possible, however, we ought to resolve some of the basic practical problems when they are appropriately presented, including whether, as a constitutional matter, any particular racial balance must be achieved in the schools; to what extent school districts and zones may or must be altered as a constitutional matter; to what extent transportation may or must be provided to achieve the ends sought by prior holdings of this Court. Other related issues may emerge. However, for the reasons stated, namely that the Court is already disabled by a vacancy of long standing and further disabled in this particular case, if not earlier, I join the result reached by the Court."

This comes through loud and clear. Sometime in the not too distant future a definitive decision in these matters will be made. Meanwhile, it is our duty to make school integration a reality, remembering that nothing is to be gained and much is to be lost if we are not realistic and sensible in approaching the problem. This must be remembered by both black and white.

### THE CIVIL RIGHTS ACT OF 1964

The individual plaintiffs have submitted a memorandum concerning the validity, significance and applicability, etc., to the cases before the Court of Section 407 (a) (2) of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000c–6.

That section provides that:

* * * nothing herein shall empower any officer or court of the United States to issue any order seeking to achieve a racial balance in any school by requiring the transportation of pupils or students from one school to another or one school district to another in order to achieve such racial compliance with constitutional standards.

The language and the legislative history of the section were reviewed in United States v. Jefferson County Board of Education, 372 F.2d 836, 880 (1966), aff'd en banc, 380 F.2d 385 (5th Cir.), cert. denied sub nom. Caddo Parish School Board v. United States, 389 U.S. 840, 88 S.Ct. 67, 19 L.Ed.2d 103 (1967) where the Fifth Circuit Court held that Section 407(a) (2) did not restrict the remedial powers either of HEW or of the federal courts in school desegregation suits brought to redress the deprivation of constitutional rights.

Numerous other federal courts have since passed upon this section and all have concluded that the Act does not bar a federal court from requiring busing as a means of achieving integration if such is necessary to meet the affirmative obligations of school boards to erect unitary non-racial school systems. United States v. School District No. 151 of Cook County, 286 F.Supp. 786 (N.D.Ill.), aff'd 404 F.2d 1125 (7th Cir., 1968); Moore v. Tangipahoa Parish School Board, Civil No. 15556 (E.D.La., July 2, 1969); Keyes v. School District No. 1, Denver, 303 F.Supp. 289 (D.Colo., Aug. 14, 1969), stay pending appeal granted (10th Cir. No. 432–69, Aug. 27, 1969), stay vacated, 396 U.S. 1215, 90 S.Ct. 12, 24 L.Ed.2d 37 (Mr. Justice Brennan, Acting Circuit Justice, Aug. 29, 1969); Dowell v. School Board of Oklahoma City, Civil No. 9452 (W.D.Okl., Aug. 8, 1969), vacated (10th Cir. No. 435–69, Aug. 27, 1969), reinstated, 396 U.S. 269, 90 S.Ct. 415, 24 L. Ed.2d 414, (Mr. Justice Brennan, Acting Circuit Justice, Aug. 29, 1969); cf.

Swann v. Charlotte-Mecklenburg Board of Education, 300 F.Supp. 1358 (W.D. N.C., April 23, 1969).

## BUSING

A major objection of the School Board to both the HEW and Justice plans is that these plans would require a substantial additional amount of busing. There is busing in Rapides Parish, but the Government's plans would sharply increase the already substantial busing. The students who are being bused now are being bused to the nearest school (6,633 of them). The students who are living within a mile of their schools, as most of the elementary children do, are not being bused, and these are the children who will be uprooted under HEW-Justice plans. They would be taken from their neighborhoods, placed on a bus, and transported to another neighborhood to attend school. This type of busing is entirely different from that now in existence. Under HEW-Justice, an additional 1,200 children who are not now being bused and who live directly across from or very close to a neighborhood school would be affected. Under those plans there would be a good chance that a child starting in the first grade would attend a neighborhood school not more than three of his 12 years. What HEW and Justice are saying to the school child is this: Because of your race, you will leave and be transported to another place, and there you will attend school. Such compulsion is bound to be resented deeply by all people involved, both black and white.[7] The Justice plan would require at least 15 additional buses and drivers. Under the State law, each bus driver receives $2,740 per annum as base pay, and in addition, each bus driver receives an operator's rate, based upon the mileage he travels. The operator's rate, based on mileage, will average approximately $100 per mile per year. This would mean that the 15 additional buses would cost $41,000 per year in base salaries, and $40,000 per year in mileage rates for a total of $81,000 additional expense per year. (See Affidavit of Parks). The hard truth is that the Rapides Parish School Board is not in good financial shape. It is scheduled to end the year with a deficit. Next year the prospects are not bright. Then, too, if a plan like HEW is ordered, there is no question but that a movement of mass escapism from the public school system would ensue. It was estimated that for each student lost the system would lose $400. If the system were to lose 1,000 students, $400,000 in state appropriations might be withdrawn. The School Board is not in a financial condition to activate either HEW or Justice. We hope that we will not be placed in the position of ordering the School Board to do something which will require it to expend more money than they have. We read in the papers and hear news reports that the federal government is going to make money available. Rapides Parish will need some of that money. It is easy enough to argue that the School Board already spends all this money on busing, so what is another $80,000, or what is another $400,000 if students abandon the public school system. The School Board cannot print or coin money. Where is the money to come from? Should the School Board reduce the quality of education by doing without new textbooks, teachers or plant facilities? Can we propose that they do away with libraries and health services, or fuel and heat, the

---

7. The Gallup poll published in many papers on April 5, 1970, includes the following conclusions:

"By the lopsided margin of eight to one, parents vote in opposition to busing, which had been proposed as a means of achieving racial balance in the nation's classrooms.

"Opposition to busing arises not from racial animosity but from the belief that children should attend neighborhood schools and that busing would mean higher taxes. This is seen from a comparison of attitudes on busing with those on mixed schools.

\* \* \* \* \*

"When Negro parents are asked the same series of questions, the weight of sentiment is found to be against busing."

plant supplies, or the school lunch employees? What programs are to be cut? Nothing is to be gained and much is to be risked or lost by driving the process of desegregation to the tipping point of escapism or resegregation. Segregation is a "dead duck" and the funeral is over, save and except for a few vocal extremists, black and white. Our task is to fashion a remedy which will insure that no person is effectively excluded from any school because of race. We have endeavored to carry out this duty without burying the public schools. Any plan which results in harming the attendance and financing of public schools presents serious and substantial administrative, economic and educational problems. From an education standpoint, we agree with the HEW approach used and adopted in the rural wards, because in those wards the approach was basically neighborhood zoning. The schools were very close to each other and there was no overall residential pattern. In Wards 1 and 8 the busing concept from one neighborhood to another is urged by the government. This includes some non-contiguous zoning—desegregating by drawing boundaries so that students of one race are transported by bus to schools of another race when other schools are closer to home. Some educators say this is commendable. Others disagree. Allen Nichols and R. A. Townsend are in the latter category. Their opinions appear in the record, i. e., that the HEW approach in Wards 1 and 8, from a professional educational standpoint, can only result in the lowering of academic standards, whereas a neighborhood unitary school system would serve both the purposes of integration and quality education. They also point out that the pairing approach in Wards 1 and 8 results in very complicated grouping procedures and necessitates massive student exchanges between schools. They also state that the approach of HEW results in a constant changing of schools by pupils as they advance in their school years. For example, if schools are allotted only one or two grades, as suggested by the HEW elementary plan, this might necessitate a change by a student every two years, which would mean that in his first eight years of school he would attend four different schools, while maintaining the same residence. According to Nichols and Townsend, all the educators they know believe that this is not a proper environment for education of elementary school children. They also insist that the pairing method completely obliterates most extra-curricular activities and will surely destroy school spirit and morale which are strong ingredients in the successful development of a sound academic program. They also believe that crosstown busing from one neighborhood school area to another is just not desirable in the interest of education, inasmuch as it would double and sometimes triple the busing time which would not otherwise be required.

## CONCLUSION

The plan as presented by the School Board at the Hearing of April 13, 1970, is rejected. The HEW-Justice plans are rejected.

Subsequent to dictating this opinion, the Honorable Ben C. Connally, Chief Judge of the Southern District of Texas, entered his opinion of June 1, 1970, ordering the Houston Independent School District to institute what he referred to as an "equidistant zoning plan of racial integration." That decision, like this Court's, is patterned upon *Orange County*. Judge Connally, in rejecting crosstown busing, made this pertinent observation:

"Our hypothetical student well might say to the Superintendent of Instruction, 'You are excluding me from School A, two blocks from my home, because I am black, and for no other reason. How can you do this when the Supreme Court of the United States in its latest pronouncement on the subject imposes on you the duty to operate as [a] unitary school system *within which no person is to be effectively excluded from any school be-*

*cause of race or color?'* I would be interested to know how this question would be answered." (Emphasis added.)

Following the pattern of Ellis v. Orange County, and United States v. Hinds County School Board, 433 F.2d 611 (5th Cir., 1970), a bi-racial committee is to be constituted from the names submitted by the parties to this suit. It is noted here that the black community has already formed its committee and Reverend Wray is its secretary. Many thinking people believe that racial discrimination is more directly related to job and housing opportunities than to school patterns. I have endeavored to listen to whites and blacks and have enjoyed a small degree of communication, but many with whom I have met were in no humor to listen to a white judge preach the evidences of black progress. Their emphasis was on the obvious inability of the white man, even faintly, to comprehend what gnaws at the heart and soul of the black man, but this coin has two sides and often black people cannot comprehend that whites also experience frustration and injustice. Communication between the races is difficult on today's market. That is why it is so important that a bi-racial committee be activated. This committee is to be charged with the responsibility of investigating, consulting, and advising with the School Board periodically, with respect to all matters tending to promote a unitary system as ordered by the Fifth Circuit in *Ellis* and *Singleton IV*.

If ever there was a time when a court should bend every effort to be credible and persuasive to those affected by its order, that time is now. The answer which the Court gives for Wards 1 and 8 is: Go to the school nearest to which you live. No one is effectively excluded from any school because of race. Most students are assigned to schools with fully integrated student bodies. The remaining are not condemned to a segregated public school education. If such a prospect exists, it may be corrected immediately, at the desire of any child so affected, who may transfer, and ride free of charge, to the nearest school in which his race is in a minority. Thus every Negro child has the opportunity for an integrated education today—the majority simply by attending the school nearest his home. They will receive such education from a completely integrated faculty and staff.

The plan as enunciated herein constitutes a unitary system and is to be implemented forthwith. This opinion constitutes findings, conclusions and order.

Thus done and signed in Chambers at Lake Charles, Louisiana, on this the 5th day of June, 1970.

/s/ EDWIN F. HUNTER, JR.
UNITED STATES
DISTRICT JUDGE

## APPENDIX B

| | District Court's Order | Opinion This Court's |
|---|---|---|
| Number of schools left all- or virtually all-Negro under— | | |
| Elementary | 5 | 1 |
| Junior High | 1 | 0 |
| Senior High | 1 | 0 |
| | 7 | 1 |
| Number of Negro students attending all- or virtually all-Negro schools under— | | |
| Elementary | 2,179 | 634 |
| Junior High | 516 | 0 |
| Senior High | 1,200 | 0 |
| | 4,435 | 634 |
| Percentage of Negroes attending all- or virtually all-Negro schools | 60% | 9% |