511 F.2d 1374
 Arlam CARR, Jr., a minor by Arlam Carr and Johnnie Carr,
etc. et al., Plaintiffs-Appellants, National
Education Association Inc., Intervenor,
Penelope Anne Jenkins et al.,
Intervenors-Appellants,
v.
MONTGOMERY COUNTY BOARD OF EDUCATION et al., etc.,
Defendants-Appellees, United States of America,
Amicus Curiae.
 No. 74-2633.
 United States Court of Appeals, Fifth Circuit.
 April 11, 1975.
Rehearing and Rehearing En Banc Denied June 27, 1975.
 
 Soloman S. Seay, Jr., Fred D. Gray, Montgomery, Ala., Jack Greenberg, Norman J. Chachkin, NAACP, Legal Defense & Education Fund, New York City, for Arlam Carr, and others.
 Howard A. Mandell, Montgomery, Ala., for Penelope A. Jenkins, and others.
 Joseph D. Phelps, Vaughan Hill Robinson, Montgomery, Ala., for Montgomery Cty. Bd. of Education, and others.
 Ira DeMent, U.S. Atty., Montgomery, Ala., Robert Pressman, Atty., Civ. Rights Div., U.S. Dept. of Justice, Washington, D.C., amicus curiae for U.S.A.
 Appeals from the United States District Court for the Middle District of Alabama; Frank M. Johnson, Jr., Chief Judge.
 Before GEWIN, GOLDBERG and DYER, Circuit Judges.
 PER CURIAM:
 
 APPENDIX A
 
 1
 IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT
 
 OF ALABAMA, NORTHERN DIVISION
 
 2
 ARLAM CARR, JR., ET AL., Plaintiffs,
 
 
 3
 NATIONAL EDUCATION ASSOCIATION, INC.; PENELOPE ANNE
 
 
 4
 JENKINS; ET AL., Plaintiff-Intervenors,
 
 
 5
 UNITED STATES OF AMERICA, Amicus Curiae,
 
 
 6
 v.
 
 
 7
 MONTGOMERY COUNTY BOARD OF EDUCATION, ET AL., Defendants.
 
 CIVIL ACTION NO. 2072-N
 JUDGMENT
 
 8
 Pursuant to the findings of fact and conclusions of law made and entered in a memorandum opinion filed in this cause this date, it is the order, judgment and decree of this Court that:
 
 
 9
 1. The plans presented by the plaintiffs and plaintiff-intervenors for the further desegration of the Montgomery County school system be and are hereby rejected.
 
 
 10
 2. The plan presented by the defendant Montgomery County Board of Education on January 15, 1974, revised on March 29, 1974, and modified on May 8, 1974, be and is hereby approved and ordered implemented.
 
 
 11
 3. The school board's plan will be implemented forthwith, with the student assignments to the various schools within the system to be effective with the commencement of the 1974-75 school year.
 
 
 12
 4. The school board will file with this Court on September 15, 1974, and on February 15, 1975, and on said dates each year thereafter, written reports reflecting the actual student and teacher assignments, by race, in each school in the system.
 
 
 13
 5. The costs incurred in this proceeding be and they are hereby taxed one-half against the plaintiffs and one-half against the plaintiff-intervenors.
 
 
 14
 Done, this the 22nd day of May, 1974.
 
 
 15
 (s) Frank M. Johnson
 
 UNITED STATES DISTRICT JUDGE
 GOLDBERG, Circuit Judge (dissenting):
 
 16
 Respectfully, but without equivocation, I dissent.
 
 
 17
 This suit was brought in 1964 to desegregate the public schools in Montgomery County, Alabama. Its progress has been recorded at several stages in opinions by the able District Judge, by this Court, and by the Supreme Court.[1] In August, 1973, the district court ordered the parties then in this case--the plaintiffs, the defendant School Board, and the United States--to submit proposals for further desegregation of the Montgomery County system in light of decisions by this Court and the Supreme Court since the entry in 1970 of the last comprehensive order in the case. One week later, plaintiffs-intervenors, Jenkins, et al., filed their motion to intervene, which was granted in February, 1974. During the first four months of 1974, plaintiffs, plaintiffs-intervenors, and the School Board each prepared and proposed new pupil assignment plans. Hearings were held on each plan in April. The School Board amended its plan in response to prodding from the Bench, and in an order entered May 22, 1974, and opinion reported at 377 F.Supp. 1123, the district court adopted the School Board plan, as amended, in its entirety. Costs were taxed half against the plaintiffs and half against the plaintiffs-intervenors.
 
 
 18
 The plaintiffs, the plaintiffs-intervenors, and the United States appeal, arguing between them that the district court erred in adopting the School Board's plan for the assignment of elementary and high school students, that the School Board assignment plan saddles black elementary school students with a disproportionate transportation burden, and that costs should have been taxed against the School Board.
 
 
 19
 I would hold that the district court should not have adopted the School Board's proposed assignment plan for the elementary grades because it fell short of establishing a unitary school system, and there was no sufficient finding that no workable alternative could be implemented. The record indicates additionally that the School Board plan for the assignment of junior high students, as implemented, fails to comply with constitutional mandates. Accordingly, I would remand to the district court for further proceedings to develop workable unitary school assignment plans for the elementary and junior high grades. In light of this I would find it unnecessary at this time to pass on the appellants' claims of unequal transportation burdens. I would vacate the district court's award of costs in favor of the School Board, to permit the entry of an appropriate award after the further proceedings on remand.
 
 
 20
 * Background
 
 
 21
 For the 1973-74 term, Montgomery County public schools enrolled 36.016 students, 17,042 (47%) of whom were black, and 18,974 (53%) white, in some 54 regular schools, organized along a 1-6, 7-9, 10-12 pattern. The 36 elementary schools enrolled 18,449 students (9,279, or 50%, black), the 13 junior high schools, 9,644 (4,390, or 45%, black), and the 5 high schools 7,923 (3,373, or 43%), black)[2] All but 7 of the schools then in sue stood within the corporate limits of the City of Montgomery, and the total county population is similarly concentrated within the City.
 
 
 22
 The student population residing in the area of Montgomery County outside the City is predominantly black. Within the City the student population is predominantly white: the eastern half of the City is more concentratedly white; most of the western half is virtually all-black; and a narrow integrated corridor running North-South bisects the City. Under the desegregation plan adopted in 1970 and effective in 1973-74, most pupils within the City were assigned to neighborhood schools. Outside the City, school children in all but the extreme south of the county[3] were organized into "periphery zones." Most of these "periphery zones." Most of these "periphery zone" students were bused to schools in the City, and they made up the majority of the 11,176 students (31%) bused by the county.[4]
 
 
 23
 Implementation of the neighborhood-assignment based plan adopted in 1970 left a high number of all-one-race or virtually all-one-race schools. The record discloses that in the Spring of 1974, 15 elementary schools were 87% or more black, and 6 were 87% or more white; 6 junior highs were 94% or more black, another was 85% black, and 1 was 90% white; 1 senior high was 99% black, and another was 86% black. Responding to these conditions, in its order below the district court replaced its 1970 plan with the School Board's most current proposal. That plan adheres to the techniques employed in the 1970 plan, and, unlike the plans suggested by the plaintiffs and plaintiffs-intervenors, eschews pairing or clustering of schools.
 
 
 24
 At the high school level, the School Board plan employes rezoning and peripheral reassignments to reduce the percentages of black students at each City school to 33-48%; only Montgomery County High School, in the extreme south of the County, retains an 87% black student body.[5] None of the appellants question the propriety of this high school plan, and it requires no further discussion. Rather, this appeal was brought to test the constitutional sufficiency of the School Board's student assignment plans for the elementary and junior high levels. I will discuss each of the two educational stages in turn.
 
 II
 Elementary School Plan
 
 25
 The plaintiffs and plaintiffs-intervenors each proposed alternative plans for assignment of elementary school students. Each plan aimed at eliminating "racially identifiable" schools, defined at the outset by each plan's architect as a school whose racial balance varied more than 10-15% from the racial make-up of the county-wide student body for that level. Neither plan clung strictly to such statistical profiles, however, and each left at least one virtually all-black elementary school.
 
 
 26
 The plaintiffs' plan was directed only toward the elementary schools within the City. It generally retained the zone lines drawn by the School Board, but changed assigned patterns within those zones through pairing and clustering, and some modification of peripheral assignments, to reach a 24-66% black concentration in each city school. The district court calculated that implementation of the plaintiffs' plan would require reassignment of 43% of the elementary school population and additional transportation of 28% of the elementary student body. The district court concluded that the plaintiffs' plan was designed "for the sole purpose of attaining a strict racial balance in each elementary school involved," 377 F.Supp. at 1129, and that the increased busing, large scale reassignment of students and teachers, and the "fracturization of grade structure" inherent in pairing and clustering, "be disruptive to the educational processes and would place an excessive and unnecessarily heavy administrative burden on the school system." Id.
 
 
 27
 The plaintiffs-intervenors proposed a more complicated overhaul of elementary school assignments. Their plans abandoned the School Board zone lines, replacing them with two sets of new zones: one set of strip zones, running generally North-South, for grades 1-3; another set of strip zones, running generally East-West, for grades 4-6. Utilizing this basic network the plaintiffs-intervenors offered two possible plans. The simpler plan merely assigned students to the school within their proposed continuous zone. This left 400 black students in grades 4-6 in a school 81% black, and 2233 of the black primary grade 1-3 children in schools 84% or more black. The plaintiffs-intervenors' alternative, and preferred, plan retained their grade 4-6 zone pattern and the single 81% black school, but added satellite zoning to the primary grade assignments, reducing to 402 the total of black students in one 84% black primary school. The plaintiffs-intervenors' plan offered transportation advantages over the plaintiffs' plan, requiring additional busing for only 11% of the elementary school students, according to the district court. There was evidence that the plaintiffs-intervenors' plan would prove the more likely thwarted in practice, however, and the district court found that implementation of either of the plaintiffs-intervenors' plans would involve reassignment of 60-70% of all of the elementary school population. The district court entered no specific findings as to the workability of the plaintiffs-intervenors' plans.
 
 
 28
 The School Board plan adopted by the district court for the assignment of elementary school children furthers desegregation by closing 5 previously virtually all-black elementary schools and assigning some pupils from those schools to predominantly white schools, and by reassigning some 400 black students at another virtually all-black school to 4 predominantly white schools. Under this plan, however, 55% of the black students were projected to be enrolled at elementary schools 87% or more black, and 44% were expected to attend elementary schools 87% or more black, and 44% were expected to attend elementary schools 93% or more black. The statistics showing actual enrollment as of September 15, 1974, demonstrate that the true profiles are slightly worse.[6] Under the School Board plan no white elementary school students were reassigned to a school that would remain predominantly black. The School Board estimated that its elementary school plan would produce a significant net reduction of transportation.
 
 
 29
 * Unitary School System
 
 
 30
 As the Supreme Court established in Green v. School Bd. of New Kent County, 1968, 391 U.S. 430, 436, 88 S.Ct. 1689, 1693, 20 L.Ed.2d 716, 722, "The transition to a unitary, nonracial system of public education ... is the ultimate end to be brought about" in school desegregation cases. In this pursuit the school authorities and district court "will ... necessarily be concerned with the elimination of one-race schools." Swann v. Charlotte-Mechlenburg Bd. of Educ., 1971, 402 U.S. 1, 26, 91 S.Ct. 1267, 1281, 28 L.Ed.2d 554, 572. The district court, relying on Ellis v. Board of Public Instruc. of Orange County, 5 Cir.1970, 423 F.2d 203 (Ellis I ), concluded, however, that the persistence of virtually all-black elementary schools in Montgomery County under the School Board's "neighborhood assignment" plan did not prevent that system from reaching the unitary status mandated by Green. I disagree.
 
 
 31
 Ellis I approved, as modified,[7] a student desegregation plan for Orange County, Florida, which was based on neighborhood school assignments and left several virtually all-black schools. We held that "[u]nder the facts of this case, it happens that the school board's choice of a neighborhood assignment system is adequate to convert the Orange County school system from a dual to a unitary system." 423 F.2d at 208, n. 7. Ellis I did not, however, automatically sanctify any "neighborhood school" student assignment plan which placed the same percentages of students in fully integrated schools. Rather, as we explicitly cautioned,
 
 
 32
 There are many variables in the student assignment approach necessary to bring about unitary school systems. The answer in each case turns, in the final analysis, as here, on all of the facts including those which are peculiar to the particular system.
 
 
 33
 423 F.2d at 208, n. 7. This passage has become a refrain in our school desegregation decisions.[8] Indeed, our school desegregation cases are too numerous, their facts, figures, and conditions too particular, and our remedies too flexibly fashioned, to lend themselves to a simple sorting into neat rows. But I believe that the weight of our pre- Swann decisions adopting and adapting the neighborhood assignment approach of Ellis I do not permit us to certify the School Board's plan for Montgomery as the achievement of a unitary system.[9] As we concluded in Allen v. Board of Public Instruc. of Broward County, 5 Cir.1970, 432 F.2d 362, "In the conversion from dual school systems based on race to unitary school systems, the continued existence of all-black or virtually all-black schools is unacceptable where reasonable alternatives exist."[10]
 
 
 34
 Even were the School Board's plan adequate to achieve a unitary school system under Ellis I and the cases immediately following it, however, I think it manifest that the School Board's plan cannot stand after Swann; Davis v. Board of School Comm'rs of Mobile County, 1971, 402 U.S. 33, 91 S.Ct. 1289, 28 L.Ed.2d 577, and Keyes v. School District No. 1, 1973, 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548. Swann shed new light on the constitutional requisites in school desegregation cases, and since Swann we have refused to accept mere compliance with our decision in Ellis I as the mark of a school board plan's constitutional sufficiency. Indeed, we held in Ellis v. Board of Public Instruc. of Orange County, 5 Cir.1972, 465 F.2d 878, cert. denied, 1973, 410 U.S. 966, 93 S.Ct. 1438, 35 L.Ed.2d 700 (Ellis II ), that the school board was obliged to desegregate each all-black school remaining in Orange County under our prior holding.[11] See also Dandridge v. Jefferson Parish School Bd., 5 Cir.1972, 456 F.2d 552, 554,[12] cert. denied, 1972, 409 U.S. 978, 93 S.Ct. 306, 34 L.Ed.2d 240.
 
 
 35
 The concentration of black students in virtually all-black schools contradicts the assertion that the School Board's plan for Montgomery establishes a unitary school system under these controlling standards. Compare, e.g., Swann, supra; Davis, supra; Ellis II, supra; Flax v. Potts, 5 Cir.1972, 464 F.2d 865, 869, cert. denied, 1972, 409 U.S. 1007, 93 S.Ct. 433, 34 L.Ed.2d 299 (middle schools, high schools); Dandridge v. Jefferson Parish School Bd., 5 Cir.1972, 456 F.2d 552, cert. denied, 1972, 409 SU.S. 978, 93 S.Ct. 306, 34 L.Ed.2d 240; cases cited, note 9 supra; see also Keyes v. School Dist. No. 1, 1973, 413 U.S. 189, 199, n. 10, 93 S.Ct. 2686, 2692, 37 L.Ed.2d 548, 558. The teaching of Swann and Keyes is that no school which reflects vestigal discrimination through its virtually discrimination through its virtually single-race student body can be omitted from a desegregation plan unless inclusion is unworkable; where desegregation is possible we can tolerate no abandonment of some given portion of students locked into a uniracial educational experience.
 
 
 36
 In appraising a school board's plan we are, of course, attentive to conditions other than racial concentrations. I cannot agree, however, with the suggestion that compliance with the remaining five of the six requirements established in Green v. School Board of New Kent County, 1968, 391 U.S. 430, 435, 88 S.Ct. 1689, 1693, 20 L.Ed.2d 716, 722--"can immunize the School Board's plan.[13] So to conclude would ignore that "[in Green the court spoke in terms of the whole system," Ellis I, 423 F.2d at 204, and would disregard the recognition that student assignment is the most important single aspect of a desegregated school system. Our cases have always required compliance with all six particulars.[14] The School Board additionally argues that the secondary schools in Montgomery County are desegregated, and points out that we have taken note of thorough integration at the secondary level, in some cases approving assignment plans which left some all-black primary schools. See Lee v. City of Troy Bd. of Educ., 5 Cir.1970, 432 F.2d 819, 822; Hightower v. West, 5 Cir.1970, 430 F.2d 552, 555. This argument also fails here. Even assuming arguendo that the secondary schools in Montgomery County were fully integrated, we would as in the pre- Swann cases relied upon by the School Board, attach little weight to that consideration. Moreover, as it has become quite clear, "[T]his court has, with limited exceptions [not applicable here] disapproved of school board plans which exclude a certain age grouping from school desegregation." Arvizu v. Waco Indep. School Dist., 5 Cir.1974, 495 F.2d 499, 503.[15] In the light of Swann and our developed case law, it is manifest that the progressive integration of Montgomery's high schools is no excuse for the continued failure to desegregate at the elementary level.[16]
 
 
 37
 In sum, a neighborhood school assignment plan may be adequate if it establishes a unitary school system; but such assignment is not "per se adequate." Davis v. Board of School Comm'rs of Mobile County, 1971, 402 U.S. at 37, 91 S.Ct. at 1292, 28 L.Ed.2d at 581. A review of the circumstances of the Montgomery County system, particularly the concentration of black elementary students in virtually all-black schools, reveals that the School Board plan approved by the district court was insufficient to achieve a unitary school system as required under Green and Swann. Such a plan can stand only if its lack of unitary status is not attributable to state action, or if no further remedy is workable.
 
 B
 Residential Patterns
 
 38
 The district court declined to require further desegregation of the remaining virtually all-black elementary schools in Montgomery County, in part because it considered the persistence of those schools to be "a result of residential patterns and not of the school board's action--either past or present." 377 F.Supp. at 1132. Because the district court's opinion offers no supporting discussion, it is unclear whether the district court believed that the present existence of virtually all-black schools could be laid in part to residential patterns established during the period of statutory school segregation yet not induced by that state action, or that the development of racially identifiable neighborhoods since the onset of efforts to integrate the schools had precipitated the virtually all-black schools.[17] In either event, I think the district court erred in its legal determination.
 
 
 39
 Aware that "[p]eople gravitate toward school facilities, just as schools are located in response to the needs of people," the Supreme Court has recognized that
 
 
 40
 [t]he location of schools may ... influence the patterns of residential development of a metropolitan area and have important impact on composition of inner-city neighborhoods.
 
 
 41
 In the past, choices in this respect have been used as a potent weapon for creating or maintaining a state-segregated school system.
 
 
 42
 Swann, 402 U.S. at 20, 21, 91 S.Ct. at 1278, 28 L.Ed.2d at 569.
 
 
 43
 Moreover,
 
 
 44
 [A] connection between past segregative acts and present segregation may be present even when not apparent and ... close examination is required before concluding that the connection does not exist. Intentional school segregation in the past may have been a factor in creating a natural environment for the growth of further segregation.Keyes, 413 U.S. 189, 211, 93 S.Ct. 2686, 2699, 37 L.Ed.2d 548, 565.
 
 
 45
 Accordingly, the Swann Court held that while
 
 
 46
 the existence of some small number of one-race, or virtually one-race, schools within a district is not in and of itself the mark of a system that practices segregation by law [,] ... in a systems with a history of segregation the need for remedial criteria of sufficient specificity to assure a school authority's compliance with its constitutional duty warrants a presumption against schools that are substantially disproportionate in their racial composition. Where the school authority's proposed plan for conversion from a dual to a unitary system contemplates the continued existence of some schools that are all or predominately of one race, they have the burden of showing that such assignments are genuinely nondiscriminatory. The court should scrutinize such schools, and the burden upon the school authorities will be to satisfy the court that their racial composition is not the result of present or past discriminatory action on their part.
 
 
 47
 Swann, 402 U.S. at 26, 91 S.Ct. at 1281 28 L.Ed.2d at 572.
 
 
 48
 The School Board may satisfy its burden "only by showing that its past segregation acts did not create or contribute to the current segregated condition of the ... [particular] schools." Keyes, 413 U.S. at 211, 93 S.Ct. at 2699, 37 L.Ed.2d at 565.
 
 
 49
 There is no evidence to support a conclusion that the existence of virtually all-black neighborhood elementary schools, so far as they derive from residential patterns etched before school desegregation, is innocent of past discrimination action by the School Board. The opinion below lacks the detailed factual findings by the district court which should reflect the "close scrutiny" required under Swann and Keyes, and the record bears no evidence to support the conclusion that the link between past and present segregation has been severed. While there is must evidence of the residential separations between whites and blacks in Montgomery, which in some cases shows that those patterns are not new, evidence of this sort is insufficient to overcome the presumption established in Swann connecting the development of persistently segregated residential patterns with state-mandated school segregation. See also Dandridge v. Jefferson Parish School Bd., 5 Cir.1972, 456 F.2d 552, cert. denied, 1972, 409 U.S. 978, 93 S.Ct. 306, 34 L.Ed.2d 240.
 
 
 50
 These principles establish equally well that racial segregation in the Montgomery County elementary schools cannot be excused on the ground that segregated residential patterns of some neighborhoods from which the one-race neighborhood schools draw have crystallized as the result of population shifts by private residents since the court's initiation of school desegregation. Such an argument has previously been rejected by this Court.[18] To be sure, the Supreme Court has made clear that after a school system attains unitary status,
 
 
 51
 the communities served by such [a system may not] remain demographically stable [;] ... in a growing, mobile society, few will do so. Neither school authorities nor district courts are constitutionally required to make year-by-year adjustments of the racial composition of student bodies once the affirmative duty to desegregate has been accomplished and racial discrimination through official action is eliminated from the system.
 
 
 52
 Swann, 402 U.S. at 31-32, 91 S.Ct. at 1283, 28 L.Ed.2d at 575.
 
 
 53
 But in Montgomery a unitary system has never been achieved, for "[t]he vestiges of state-imposed segregation [have not] been eliminated from the assignment of elementary school students," Flax v. Potts, 5 Cir.1972, 464 F.2d 865, 868, cert. denied, 1972, 409 U.S. 1007, 93 S.Ct. 433, 34 L.Ed.2d 299, as required under Swann.[19]
 
 
 54
 The district court discarded the plans proposed by the plaintiffs and plaintiffs-intervenors, after determining that they aimed at balancing black/white student populations on abstract ratios, rather than simply creating a unitary assignment plan. Although the plaintiffs and plaintiffs-intervenors protest that their use of ratios as indicators of residually discriminatory school assignments remained within the bounds approved by the Supreme Court in Swann, 402 U.S. at 22-25, 91 S.Ct. at 1279-80, 28 L.Ed.2d at 570-72, I would not hold that the district court abused its discretion in choosing not to follow those plans. Nevertheless, the elimination of those proposals did not relieve the district court of its duty to exercise its "broad power of fashion a remedy that will assure a unitary school system," and to "make every effort to achieve the greatest possible degree of actual desegregation and ... [eliminate] one-race schools." Swann, 404 U.S. at 16, 26, 91 S.Ct. at 1281, 28 L.Ed.2d at 567, 572. Upon determining that none of the alternatives presented was satisfactory, the district court should have held further proceedings to forge a workable and effective plan. See Cisneros v. Corpus Christi Indep. School Dist., 5 Cir. (en banc) 1972, 467 F.2d 142, 152 cert. denied, 1973, 413 U.S. 922, 93 S.Ct. 3052, 37 L.Ed.2d 1044. The district court could support its failure so to proceed only by a conclusion that no further desegregation of the elementary school population was workable on any plan.
 
 
 55
 The School Board has consistently maintained that no workable means exists for increasing desegregation in the elementary schools, and the district court agreed, finding "that the remaining predominantly black schools cannot be effectively desegregated in "a practical and workable manner" and that the School Board plan achieved "the greatest possible degree of actual desegregation, taking into account the 'practicalities of the situation.' " 377 F.Supp. at 1135. These conclusions are drawn on insufficient or improper factual considerations, however, and are thus inadequate as a matter of law.
 
 
 56
 The district court reasoned that any further elementary school desegregation would require cross-busing of black and white students which "would not, under the circumstances of this case, accomplish any realistically stable desegregation." F 377 F.Supp. at 1132.[21] The opinion carries no discussion or subsidiary findings to explain its concern with the stability of desegregation. Apparently the district court was persuaded by the School Board's attempt[22] to demonstrate that busing of white children into black neighborhoods to attend traditionally black schools would in many cases be met with withdrawal of white students from those schools. But it is well settled that the threat of "white flight," however likely, cannot validate an otherwise insufficient desegregation remedy.[23] To the extent that it considered white flight as a factor requiring the moderation of desegregation otherwise to be ordered, the district court was in error.
 
 
 57
 The opinion below does not sufficiently explicate the remaining factors (other than stability) that the district court appraised and the reasoning it followed in determining that no further elementary school desegregation was feasible beyond that suggested by the School Board. The district court simply specified the total of children to be reassigned and the number of students to be newly bused under the plaintiffs' and plaintiffs-intervenors' plans; observed without any specific findings that busing would involve a substantial increase in the time and distance that students would have to travel to school; and then concluded that the plaintiffs'--but not the plaintiff-intervenors'--plan "would be disruptive to the educational processes and would place an excessive and unnecessarily heavy administrative burden on the school system." These findings are an inadequate foundation on which to rest either a determination of the unworkability of the proposed plans or a conclusion that no improvement of the Board's solution could be obtained. Nor does the fact of the record reveal any inherent obstacle to the progress of all further desegregation in Montgomery through the instruments of zoning, pairing, and busing. Each of these tools has been approved in Swann, 402 U.S. at 27-29, 91 S.Ct. at 1281-82, 28 L.Ed.2d at 573-74, and Cisneros v. Corpus Christi Indep. School Dist., 5 Cir. (en banc) 1972, 467 F.2d 142, 152-53, cert. denied, 1973, 413 U.S. 922, 93 S.Ct. 3052, 37 L.Ed.2d 1044, and repeatedly utilized in this circuit.
 
 
 58
 We have where necessary, required both rezoning[21] and pairing or clustering,[25] and while pairing may not be the remedy of first resort,[26] we have said and repeated that "where all-black or virtually all-black schools remain under a zoning plan, but it is practicable to desegregate some or all of the black schools by using the tool of pairing, the tool must be used."[27] The record, insofar as it reveals the administrative practicalities associated with rezoning and pairing or clustering, does not appear to preclude the imposition of all measures beyond those desired by the School Board. The record fails to indicate in any way how Montgomery's situation differs from the conditions existing in any of the many other school districts in which we have specified that these meansures be employed. Indeed, examination of the record suggest the feasability of their utilization in several instances.[28] Accordingly, I would hold that the district court erred in approving the School Board plan, and remand the cause for implementation of a constitutionally sufficient plan.
 
 
 59
 To summarize, I would hold that the district court erred in adopting the School Board plan, because that plan falls short of the constitutional mark, and because there is no indication of the unworkability of a Constitutional remedy. I do not believe the district court's result can be upheld on any of the argument advanced, whether independently or cumulatively considered. If there be no other way to desegregate, the tools of pairing and clustering must be used to relieve the barricaded and beleagured blacks from their school garrisons. These mixing mechanisms have received judicial blessing, and they must be employed unless manifestly unusable for constitutional reasons. Other innovations may be considered. Nothing to achieve the constitutional mandate to desegregate can be avoided because of whimsy, white flight and fright, inconvenience, annoyance or any other actual or conjured excuse. Desegregation of education is a constitutional necessity and not an optional luxury, and bland generalities will not suffice to justify segregated schools.
 
 
 60
 I would be unwilling to require the immediate implementation of any of the alternative elementary school plans presented, however, in light of the district court's determination that the plans of the plaintiffs and plaintiffs-intervenors were generated to achieve racial ratios beyond and in contravention of the mandate of Swann, in light of the state of the record, and in light of the opportunity remaining for the district court to define and meld the various plans before it.[31] Rather I would remand the case to the district court for further proceedings to develop a proper plan. We have in the past required specific and detailed findings to accompany the district court's selection of a desegregation remedy that promises to be less effective than alternative plans for establishing a unitary school system.[32] This requirement is meant to secure to the reviewing court the full advantages of the factual appraisals and perspective of the particularly well-situated trail court, in order to maximize the benefits of the district court's informed discretion. Cf. Brown v. Board of Educ. of Topeka, 1955, 349 U.S. 294, 299-300, 75 S.Ct. 753, 755-756, 99 L.Ed. 1083, 1105-06 (Brown II). Thus I would direct that, if the district court should approve on remand a plan less than fully effective in establishing a unitary school system in Montgomery County, it must support its conclusion with precise and detailed findings of fact, keeping in mind Swann's heavy burden upon officials to legitimate any less than thorough desegregation plan on ground of unworkability.[33]
 
 
 61
 All things being equal, with no history of discrimination, it might well be desirable to assign pupils to schools nearest their homes. But all things are not equal in a system that has been deliberately constructed and maintained to enforce racial segregation. The remedy for such segregation may be administratively awkward, inconvenient, and even bizarre in some situations and may impose burdens on some; but all awkwardness and inconvenience cannot be avoided in the interim period when remedial adjustments are being made to eliminate the dual school systems.
 
 
 62
 402 U.S. at 28, 91 S.Ct. at 1282, 28 L.Ed.2d at 573. Many practicalities affect the judgment and aims of school authorities in pursuing their daily occupation of maintaining a pragmatic educational system. But when the constitutionally mandated establishment of a unitary school system rests in the balance, workaday practicalities are no longer determinative factors. The conservation of such daily efficiencies may have been a considered objective in the days of Plessy v. Ferguson, 1896, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256, but Brown v. Board of Educ. of Topeka, 1954, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (Brown I), has taken us down a new road. Brown and its post-adolescent progeny have imposed upon school authorities and courts and affirmative duty to see that such stumbling blocks in the path of desegregation are relegated to a footnote in history. As we observed in a prior Montgomery case,[34] "This obligation is unremitting, and there can be no abdication, no matter how temporary." A school board's plan may have any number of advantages when appraised in ordinary perspective, but these give way where they impeded the progress of desegregation; convenience as well as custom must bend to constitutional prescription.
 
 
 63
 Given my resolution of this aspect of the attack on the School Board's plan for the elementary grades, I would find it unnecessary to consider at this time whether that plan imposes a discriminatorily harsh burden on the black students.
 
 III
 Junior High School Plan
 
 64
 The junior high school student assignment plan in effect in the Spring of 1974 left over half of the black students in 7 junior high schools which were over 85% black. The School Board plan, as implemented by the district court, proposed to reduce this concentration through rezoning, peripheral reassignments, and the elimination of three black schools; the district court projected that McIntyre Junior High, enrolling 792 of the County's black junior high students (18%) would remain the only high facility[35] more than 80% black under the School Board plan.
 
 
 65
 Both the plaintiffs and plaintiffs-intervenors submitted alternative plans for desegregation at the junior high level. The plaintiffs proposed to modify the basic School Board plan through additional busing to achieve a closer racial balance at McIntyre and two other junior high schools left substantially black under the Board plan, Bellingrath and Baldwin. The plaintiffs-intervenors projected a 65% black student body at McIntyre, and a less than 60% black enrollment at each of 8 other junior high schools within the City, under a plan of new elongated but continuous strip zones, with transportation to be provided within each zone where necessary. In adopting the School Board plan for the junior high schools, the district court dismissed these alternative proposals as too inflexibly wedded to abstract racial balancing, and suggested that they were unfeasible. Emphasizing the insolation of McIntyre as the only virtually all-black junior high remaining under the School Board plan, the district court held that "under the circumstances that exist in the Montgomery school system" no further requirement of desegregation could be imposed upon the County. 377 F.Supp. at 1139.[36]
 
 
 66
 Unfortunately, the data revealing the actual desegregation at the junior high schools accomplished under the School Board plan, as of September 15, 1974, show that "the circumstances" have changed.[37] False to predictions, the student body of McIntyre Junior High is 98% black, Baldwin is 85% black, and Bellingrath is, as I compute it,[38] 81% black. Thus, more than a quarter of the black junior high school students in the City[39] are locked in schools 85% or more black, and nearly 40% in schools 80% or more black.
 
 
 67
 I would not pass now on the academic question of the acceptability of the School Board plan as proposed and implemented by the district court. It is now clear that the School Board plan has been unsuccessful, as implemented, in accomplishing desegregation at the junior high level,[40] and there is no indication on the record that the present circumstances are beyond remedy. As the previous discussion of the elementary school plan should make clear, the School Board plan for the junior high schools cannot stand as it appears, unless improvement is unworkable. The record does not suggest what remedial plan might be employed at this stage. I would leave that difficulty for resolution by the district court, following whatever further proceedings it might find to be necessary. I would emphasize again, however, that the district court's order should be accompanied with supporting findings and conclusions of sufficient precision and detail to fully apprise a reviewing court of its reasons and understanding.
 
 IV
 Conclusion
 
 68
 We deal here with a school system whose roots were segregated by law. There is no indication that those roots have withered away, and that the racial separation in the present system is anything but the fruit of a tainted crop. The School Board still plans to cultivate its gardens separately; and it does not promise ever to integrate in any future season. Rather, its plan guarantees perennial one-race educational experiences for over a third of the black students within its elementary and junior high schools. Desegregation is not impossible in Montgomery. It might be uncomfortable, expensive, disturbing, or even disconcerting. But these words are not amendments to the Fourteenth Amendment's commands. Much progress has been made in Montgomery school desegregation, but medals earned for past performance cannot justify contemporary failure. I am confident that our respected, scholarly, and courageous trial judge did not hesitate to apply the law correctly as he saw it to the facts before him in Montgomery. I firmly believe, however, that that view of the law is erroneous and in conflict with previous decisions of this Court and the Supreme Court of the United States.
 
 
 69
 I would reverse the order of the district court insofar as it adopts and implements the School Board plans for elementary and junior high schools in Montgomery County, and remand the cause for such further proceedings as would be necessary to bring Montgomery County to a unitary system. In order to permit the district court to reconsider its award of costs against the plaintiffs and plaintiffs-intervenors in light of further proceedings, I would vacate the judgment awarding costs in favor of the School Board.
 
 
 70
 APPENDIX A
 ----------
 Adoption of the School Board plan produces the following profiles of the
-------------------------------------------------------------------------------
 elementary school student bodies:
 ---------------------------------
 Projected Enrollment Actual Enrollment 9/15/74 a
 ----------------------- ---------------------------
 Normal
 ----------
School Capacity Black White % Black Black White % Black
------------- ---------- ------ ------ ------- -------- -------- -------
Bear 630 186 505 27% 185 407 31%
Bellinger 300 186 43 81% 211 35 86%
 Hill
Bellingrath 1,230 b 115 100 53% 115 c 100 c 53%
B. T. 420 255 4 98% 232 5 98%
 Washington
Capitol Hgts. 570 119 192 38% 112 178 39%
Carver 780 421 2 99% 411 5 99%
Catoma 240 63 154 29% 54 153 26%
Chisolm 810 326 555 37% 376 505 43%
Crump 990 263 703 27% 246 745 25%
Daisy 720 445 7 98% 408 8 98%
 Lawrence
Dalraida 630 153 428 26% 143 421 25%
Dannelly 780 236 484 32% 254 512 33%
Davis 630 615 91 87% 637 45 93%
Dunbar 660 340 51 87% 328 34 91%
Fews 720 640 3 99% 641 3 100%
Flowers 780 169 573 23% 170 533 24%
Floyd 1,350 b 148 319 32% 135 d 275 d 33%
Forest Ave. 480 172 262 40% 160 283 36%
Harrison 750 184 427 30% 255 357 42%
Hayneville 1,200 669 30 95% 705 21 97%
 Rd.
Head 690 148 415 26% 111 339 25%
Highland Ave. 390 115 272 30% 118 237 33%
Highland 1,020 335 551 38% 310 513 38%
 Gardens
Johnson 660 175 550 24% 168 527 24%
Loveless 1,140 902 5 99% 876 6 99%
MacMillan 390 205 109 65% 195 75 72%
Morningview 600 134 486 22% 110 427 20%
Paterson 810 566 34 94% 550 36 94%
Peterson 600 175 299 37% 149 322 32%
Pintlala 270 204 16 93% 196 4 98%
Southlawn 600 223 492 31% 260 427 38%
Eastern --- 149 589 20% 149 e 589 e 20%
 By-Pass
Vaughan Rd. 750 188 409 32% 199 549 27%
 ----- ----- --- ----- ----- ---
Total 9,224 9,160 50% 9,164 8,676 51%
-----
 
 
 71
 APPENDIX B
 ----------
 Adoption of the School Board plan produces the following profiles of the
-------------------------------------------------------------------------------
 junior high school student bodies:
 ----------------------------------
 Projected Enrollment Actual Enrollment 9/15/74 a
 ----------------------- ---------------------------
 Normal
 ----------
School Capacity Black White % Black Black White % Black
------------- ---------- ------ ------ ------- -------- -------- -------
Baldwin 780 290 107 73% 275 48 85%
Bellingrath 1,230 b 659 390 62% 566 c 130 c 81%
Capt. Hgts. 1,200 442 730 38% 345 742 32%
Carver 660 350 545 39% 354 538 40%
Cloverdale 1,170 437 875 33% 476 891 35%
Floyd 1,350 b 288 541 35% 264 d 467 d 36%
G. Washington 1,290 357 782 31% 409 904 31%
Goodwyn 1,500 540 1,031 34% 564 917 38%
Houston Hill 570 210 383 35% 248 307 45%
McIntyre 1,500 792 14 98% 881 15 98%
Montgomery ___ ___ ___ ___ ___ ___ ___
 Cty High f
 Total 4,365 5,398 45% 4,382 4,959 47%
 -----
 
 
 72
 APPENDIX C
 ----------
 Adoption of the School Board plan produces the following profiles of the
-------------------------------------------------------------------------------
 senior high school student bodies:
 ----------------------------------
 Projected Enrollment Actual Enrollment 9/15/74 a
 ----------------------- ---------------------------
 Normal
 ----------
School Capacity Black White % Black Black White % Black
------------- ---------- ------ ------ ------- -------- -------- -------
Carver Sr. 1,100 439 660 39% 610 673 48%
Jeff. Davis 2,100 868 1,426 38% 857 1,449 37%
 Sr.
Lanier Sr. 2,250 817 1,068 43% 677 801 46%
Lee Sr. 2,300 929 1,560 37% 815 1,650 33%
Montgomery 570 399 63 86% 390 57 87%
 Cty. High f
 ---------- ------ ------ ------- -------- -------- -------
Total 3,452 4,777 42% 3,349 4,630 42%
-----
Footnotes to Appendices
-----------------------
 
 
 73
 * a See note 37.1/5
 
 
 74
 * b These figures represent normal capacity for combined elementary and
 
 
 75
 junior high grades.1/5
 
 
 76
 * c Estimated figures. For their computation see note 38.1/5
 
 
 77
 * d Estimated figures. According to the district court's opinion projected
 
 
 78
 attendance at the Floyd facility was to be 467 (148 black, 319 white) at the
 
 
 79
 elementary level, and 829 (288 black, 541 white) at the junior high level.
 
 
 80
 Actual enrollment listed by the School Board is a combined total of 1141 (399
 
 
 81
 black, 742 white) students; no break-down is given as to grade levels. For
 
 
 82
 sake of simplicity, in estimating actual enrollment I have simply reduced the
 
 
 83
 projected enrollments of students at both levels proportionally, according to
 
 
 84
 projected and actual enrollments, by race. I would, of course, direct that on
 
 
 85
 remand the district court should proceed to determine the actual enrollment
 
 
 86
 figures with certainty.1/5
 
 
 87
 * e Projected figures. No actual figures given.1/5
 
 
 88
 * f See note 37.1/5ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC
 
 PER CURIAM:
 
 89
 The Petition for Rehearing is denied and the Court having been polled at the request of one of the members of the Court and a majority of the Circuit Judges who are in regular active service not having voted in favor of it (Rule 35, Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is also denied.
 
 
 90
 Before BROWN, Chief Judge, and WISDOM, GEWIN, BELL, THORNBERRY, COLEMAN, GOLDBERG, AINSWORTH, GODBOLD, DYER, SIMPSON, MORGAN, CLARK, RONEY and GEE, Circuit Judges.
 
 
 91
 GOLDBERG, Circuit Judge, with whom BROWN, Chief Judge, and WISDOM and THORNBERRY, Circuit Judges, join (dissenting):
 
 
 92
 I respectfully dissent from the order denying the petition for rehearing and petition for rehearing en banc, for the reasons stated in my dissenting opinion 511 F.2d 1374.
 
 
 
 [1]
 Carr v. Montgomery County Bd. of Educ., M.D.Ala., 1964, 232 F.Supp. 705; further relief ordered, 1966, 253 F.Supp. 306; further relief ordered, 1968, 289 F.Supp. 674, aff'd, 5 Cir., 400 F.2d 1, aff'd, 1969, 395 U.S. 225, 89 S.Ct. 1670, 23 L.Ed.2d 263, further relief ordered by district court, 1970, [unreported], aff'd with modifications, 5 Cir. 1970, 429 F.2d 382
 
 
 [2]
 I rely here upon the figures referenced in the district court's opinion, although the plaintiffs-intervenors assign some minor inaccuracies thereto
 
 
 [3]
 These students attended Dunbar Elementary School (1-6), and Montgomery County High School (7-12), both of which remain virtually all-black under all plans proposed to the district court
 
 
 [4]
 During the 1973-74 term, some 5,388 elementary school students, 3,759 junior high students, and 2,209 senior high students were bused
 
 
 [5]
 See Appendix C; see also note 35 infra
 
 
 [6]
 See Appendix A & note 37 infra
 
 
 [7]
 The district court's opinion below, 377 F.Supp. at 1137 n. 36, erroneously reads the Ellis I opinion as approving the degree of desegregation under the Orange County plan without modification
 
 
 [8]
 See, e.g., Henry v. Clarksdale Mun.Sep.Sch.Dist., 5 Cir.1970, 433 F.2d 387, 390; Andrews v. City of Monroe, 5 Cir.1970, 425 F.2d 1017, 1019
 
 
 [9]
 See, e.g., Ross v. Eckels, 5 Cir.1970, 434 F.2d 1140, cert. denied, 1971, 402 U.S. 953, 91 S.Ct. 1615, 29 L.Ed.2d 123; Valley v. Rapides, 5 Cir.1970, 434 F.2d 144; Conley v. Lake Charles School Bd., 5 Cir.1970, 434 F.2d 35; Allen v. Board of Public Instruc. of Broward County, 5 Cir.1970, 432 F.2d 362, cert. denied, 1971, 402 U.S. 952, 91 S.Ct. 1609, 1612, 29 L.Ed.2d 123; Pate v. Dade County School Bd., 5 Cir.1970, 434 F.2d 11451, cert. denied, 1971, 402 U.S. 953, 91 S.Ct. 1613, 29 L.Ed.2d 123; Bradley v. Board of Public Instruc. of Pinellas County, 5 Cir.1970, 431 F.2d 1377, cert. denied, 1971, 402 U.S. 943, 91 S.Ct. 1608, 29 L.Ed.2d 111; Hightower v. West, 5 Cir.1970, 430 F.2d 552; Mannings v. Board of Public Instruc. of Hillsborough County, 5 Cir.1970, 427 F.2d 874. In each of these "neighborhood assignment" cases we required that the concentration of black students attending virtually all-black schools be reduced far below the level accomplished under the School Board plan for Montgomery. This is not, of course, to disregard the complex of other variables present in each case. See also Wright v. Board of Public Instruc. of Alachua County, 5 Cir.1970, 431 F.2d 1200
 
 
 [10]
 Quoted with approval in Boykins v. Fairfield Bd. of Educ., 5 Cir.1972, 457 F.2d 1091, 1095
 
 
 [11]
 We found the Orange County system could be unitary, however, although two elementary schools, to which 7% of the system's black elementary students were assigned, continued with 79% black enrollments, where 14% of the system's black students had employed the majority to minority transfer program
 
 
 [12]
 Compare Lee v. Macon County Bd. of Educ. (Anniston), 5 Cir.1973, 483 F.2d 244 (post- Swann ), with Lee v. Macon County Bd. of Educ. (Anniston), 5 Cir.1970, 429 F.2d 1218 (pre- Swann ). But cf. Lee v. Macon County Bd. of Educ. (Troy), 5 Cir.1973, 475 F.2d 748 (apparently denying interim relief only)
 
 
 [13]
 See 377 F.Supp. at 1138. I assume arguendo that the Board plan complies with the remaining five benchmarks enumerated in Green
 
 
 [14]
 See, e.g., Ellis II, supra; Valley v. Rapides, 5 Cir.1970, 434 F.2d 144; Allen v. Board of Public Instruc. of Borward County, 5 Cir.1970, 432 F.2d 362, cert. denied, 1971, 402 U.S. 952, 91 S.Ct. 1609, 1612, 29 L.Ed.2d 123; Pate v. Dade County School Bd., 5 Cir.1970, 4343 F.2d 1151, cert. denied, 1971, 402 U.S. 953, 91 S.Ct. 1613, 29 L.Ed.2d 123; Henry v. Clarksdale Mun.Sep. School Dist., 5 Cir.1970, 433 F.2d 387; Bradley v. Board of Public Instruc. of Pinellas County, 5 Cir.1970, 431 F.2d 1377, cert. denied, 1971, 402 U.S. 943, 91 S.Ct. 1608, 29 L.Ed.2d 111; City of Monroe v. Andrews, 5 Cir.1970, 425 F.2d 1017. See generally Singleton v. Jackson Mun.Sep. School District Dist., 5 Cir. (en banc) 1970, 419 F.2d 1211
 
 
 [15]
 In some cases it may prove necessary to avoid transportation of school children of very tender age, see generally Swann, 402 U.S. at 31, 91 S.Ct. at 1283, 28 L.Ed.2d at 575; Cisneros v. Corpus Christi Indep. School Dist., 5 Cir. (en banc) 1972, 467 F.2d 142, 153, cert. denied, 1973, 413 U.S. 922, 93 S.Ct. 3052, 37 L.Ed.2d 1044. But such exceptions are carefully limited, see, e.g., Flax v. Potts, 5 Cir., 1972, 464 F.2d 865, 869, cert. denied, 1972, 409 U.S. 1007, 93 S.Ct. 433, 34 L.Ed.2d 299; Lockett v. Board of Educ. of Muscogee County School Dist., 5 Cir.1971, 447 F.2d 472, 573; cf. Lee v. Macon County Bd. of Educ., 5 Cir.1973, 475 F.2d 748 (apparently denying interim relief only)
 
 
 [16]
 In cases where racially identifiable primary schools cannot feasibly be eradicated, of course, a district court should endeavor particularly to insure students from such schools will graduate to fully integrated schools
 
 
 [17]
 The record discloses that of the 11 elementary schools which retain a projected black population over 80% under the School Board's "neighborhood assignment" plan, 8 (all but Bellinger Hill, Davis, and Pintlala) had been black schools before 1970
 
 
 [18]
 See Flax v. Potts, 5 cir.1972, 464 F.2d 865, 868, cert. denied, 1972, 409 U.S. 1007, 93 S.Ct. 433, 34 L.Ed.2d 299; cf. Boyd v. Pointe Coupee Parish School Bd., 5 Cir.1974, 505 F.2d 632; Hereford v. Huntsville Bd. of Educ., 5 Cir.1974, 504 F.2d 857; Adams v. Rankin, 5 Cir.1973, 485 F.2d 324
 
 
 [19]
 Cf. Ellis v. Board of Public Instruc. of Orange County, 5 Cir.1972, 465 F.2d 8778, 879-80, cert. denied, 1973, 410 U.S. 966, 93 S.Ct. 1438, 35 L.Ed.2d 700 (Ellis II); Dandridge v. Jefferson Parish School Bd., 5 Cir.1972, 456 F.2d 552, 554, cert. denied, 1972, 409 U.S. 978, 93 S.Ct. 306, 34 L.Ed.2d 240. Moreover, there is even some indication of Montgomery County School Board action since the onset of court-ordered desegregation which may tend to perpetuate the dual system. As the district court found at a prior stage in this litigation, the location and extent of construction and expansion of elementary and secondary schools in Montgomery County have "been designed to perpetuate, and have the effect of perpetuating, the dual school system." Carr v. Montgomery County Bd. of Educ., M.D.Ala.1968, 289 F.Supp. 647, 652. See generally, Swann, 402 U.S. at 18-21, 91 S.Ct. at 1277, 28 L.Ed.2d at 568-70; cf. Keyes 413 U.S. at 201-05, 93 S.Ct. at 2694-2695, 37 L.Ed.2d at 559-61
 
 
 [21]
 The district court also forecast that the plans of the plaintiffs, and plaintiffs-intervenors would provide only "an extremely unstable desegregated system." 377 F.Supp. at 1131
 
 
 [22]
 See, e.g., Transcript, April 24, 1974, at 240
 
 
 [23]
 See, e.g., Monroe v. Board of Commissioners of City of Jackson, 1968, 391 U.S. 450, 459, 88 S.Ct. 1700, 1704, 20 L.Ed.2d 733, 739; Lee v. Macon County Bd. of Educ. (Marengo), 5 Cir.1972, 465 F.2d 369; United States v. Hinds County School Bd., 5 Cir.1969, 417 F.2d 852, 858, cert. denied, 1970, 396 U.S. 1032, 90 S.Ct. 612, 24 L.Ed.2d 531; Lee v. Macon County Bd. of Educ. (Pickens), M.D.Ala. (3 judge) 1970, 317 F.Supp. 95, 98-99. Cf., e.g., Boyd v. Pointe Coupee Parish School Bd., 5 Cir.1974, 505 F.2d 632; Hereford v. Huntsville Bd. of Educ., 5 Cir.1974, 504 F.2d 857; Adams v. Rankin, 5 Cir.1973, 485 F.2d 324
 
 
 [24]
 See, e.g., Conley v. Lake Charels School Bd., 5 Cir.1970, 434 F.21d 35, 39-41; Valley v. Rapides Parish School Bd., 5 Cir.1970, 434 F.2d 144, 147; Pate v. Dade County School Bd., 5 Cir.1970, 434 F.2d 1151, 1158, cert. denied, 1971, 402 U.S. 953, 91 S.Ct. 1613, 29 L.Ed.2d 123; Bradley v. Board of Public Instruc. of Pinellas County, 5 Cir.1970, 431 F.2d 1377, 1381-83, cert. denied, 1971, 402 U.S. 943, 91 S.Ct. 1608, 29 L.Ed.2d 111. See also Wright v. Board of Public Instruc. of Alachua Country, 5 Cir.1970, 431 F.2d 1200
 
 
 [25]
 See, e.g., Weaver v. Board of Public Instruc. of Brevard County, 5 Cir.1972, 467 F.2d 473, cert. denied 1973, 410 U.S. 982, 93 S.Ct. 1498, 36 L.Ed.2d 177; Flax v. Potts, 5 Cir.1972, 464 F.2d 865, 868-69, cert. denied, 1972, 409 U.S. 1007, 93 S.Ct. 433, 34 L.Ed.2d 299; Ross v. Eckels, 5 Cir.1970, 434 F.2d 1140, 1148, cert. denied, 1971, 402 U.S. 953, 92 S.Ct. 1614, 29 L.Ed.2d 123; Henry v. Clarksdale Mun. Sep. School Dist., 5 Cir.1970, 433 F.2d 387, 394-95; Allen v. Board of Public Instruc. of Broward County, 5 Cir.1970, 432 F.2d 367-71 (citing additional cases), cert. denied, 1971, 402 U.S. 952, 91 S.Ct. 1609, 1612, 29 L.Ed.2d 123. See also Miller v. Board of Educ. of Gadsden, 5 Cir.1973, 482 F.2d 1234; Boykins v. Fairfield Bd. of Educ., 5 Cir.1972, 457 F.2d 1091, 1095; Andrews v. City of Monroe, 5 Cir.1970, 425 F.2d 1017, 1021
 
 
 [26]
 Allen v. Board of Public Instruc. of Broward County, 5 Cir.1970, 432 F.2d 362, 367, cert. denied, 1971, 402 U.S. 952, 91 S.Ct. 1609, 29 L.Ed.2d 123, quoted in Flax v. Potts, 5 Cir.1972, 464 F.2d 865, 868, cert denied 1972, 409 U.S. 1007, 93 S.Ct. 433, 34 L.Ed.2d 299, and Boykins v. Fairfield Board of Educ., 5 Cir.1972, 457 F.2d 1091, 1095
 
 
 [27]
 See Cisneros v. Corpus Christi Indep. School Dist., 5 Cir. (en banc) 1972, 467 F.2d 142, 153, cert. denied, 1973, 413 U.S. 922, 93 S.Ct. 3052, 37 L.Ed.2d 1044; Conley v. Lake Charles School Bd., 5 Cir.1970, 434 F.2d 35, 39
 
 
 [28]
 IN regard to the initial administrative difficulties associated with re-zoning and pairing, we emphasize "[t]he fact that a temporary, albeit difficult, burden may be place on the School Board in the initial administration of the plan ... does not justify in these circumstances the continuation of a less than unitary school system and the resulting denial of an equal educational opportunity to a certain segment of the [County] children." Dandridge v. Jefferson Parish School Bd., E.D.La.1971, 332 F.Supp. 590, 592, stay denied, 1971, 404 U.S. 1219, 92 S.Ct. 18, 19, 30 L.Ed.2d 23, 24 (Marshall, J., in chambers; quoting cited language with approval), aff'd, 5 Cir.1972, 456 F.2d 552, cert. denied, 1972, 409 U.S. 978, 93 S.Ct. 306, 34 L.Ed.2d 240
 
 
 [31]
 Cf. Adams v. Rankin County Bd. of Educ., 5 Cir.1973, 485 F.2d 324, 326; Andrews v. City of Monroe, 5 Cir.1970, 425 F.2d 1017, 1021
 
 
 [32]
 See, e.g., Adams v. Rankin County Bd. of Educ., 5 Cir.1973, 485 F.2d 324, 326; Boykins v. Fairfield Bd. of Educ., 5 Cir. 1972, 457 F.2d 1091, 1097; Andrews v. City of Monroe, 5 Cir.1970, 425 F.2d 1017, 1021; cf. also, Winston-Salem/Forsyth County Bd. of Educ., 1971, 404 U.S. 1221, 1226-27, 92 S.Ct. 1236, 1239, 31 L.Ed.2d 441, 446 (Burger, C.J., in chambers)
 
 
 [33]
 See also Green v. School Bd. of New Kent County, 1968, 391 U.S. 430, 439, 88 S.Ct. 1689, 1695, 20 L.Ed.2d 716, 724
 
 
 [34]
 Carr v. Montgomery County Bd. of Educ., 5 Cir.1970, 429 F.2d 382, 386
 
 
 [35]
 The district court's opinion, following the style of the School Board plan, treats the some 252 (233 black, 19 white) junior high school student in attendance at the Montgomery County High facility as senior high school students. The apparent premise to this treatment is that "[i]t is conceded by all parties that Montgomery County High School ... cannot be effectively desegregated because of its isolation." 377 F.Supp. at 1138, n. 37. This conclusion is not contested here, although the plaintiffs-intervenors' plan did propose to reduce the junior high class at Montgomery County High from 92% to 82% black. My figures follow the style of the district court
 
 
 [36]
 The district court found that the plaintiffs' proposed plan would require reassignment of 36% of the junior high student body, and additional transportation of about 17%; the plaintiffs-intervenors' plan was forecast to require reassignment of 50-60% and additional busing of some 20%. (The plaintiffs-intervenors assert that the opinion below is clearly erroneous in its computation of busing required under their junior high plan; I would not pass on the issue at this time.) The district court did not enter any findings regarding the proportion of students reassigned, projected to be reassigned, or newly transported under the School Board plan. Nor does the opinion below reveal any specific conclusions regarding the significance of the burdens of reassigning or transporting additional students, except that the McIntyre facility "is impossible to effectively desegregate in a stable and workable manner." 377 F.Supp. at 1132
 
 
 [37]
 See Appendix B. The actual enrollment figures as of September 15, 1974, are taken from the School Board's October 1, 1974, report to the District Court, per that court's order. These figures are not challenged by any other parties. See Davis v. Board of School Comm'rs of Mobile County, 1971, 402 U.S. 33, 37, 91 S.Ct. 1289, 1291, 28 L.Ed.2d 577, 580. This data is utilized in Appendices A, B, and C
 
 
 [38]
 The actual enrollment figures for Bellingrath, as of September 15, 1974, are estimations. According to the district court's opinion, projected attendance at the Bellingrath facility was to be 215 (115 black, 100 white) at the elementary level and 1049 (659 black, 390 white) at the junior high level. Actual enrollment as of September 15, 1974, listed by the School Board is a combined total of (681 black, 230 white) students; no breakdown is given as to grade levels. The total actual attendance at Bellingrath is considerably lower than the total projected attendance. The net over-projection is 93 black students (12% of projection), and 260 white students (53% of projection). In estimating actual attendance, I have, conservatively, attributed the total decrease to the junior high level, where the enrollment was projected to be 62% black, and for which the zone was to be significantly shifted for 1974-75. I would, of course, direct that on remand the district court proceed to determine the actual enrollment figures with certainty
 
 
 [39]
 These percentages do not include the junior high students at the Montgomery County Senior High facility. See note 35 infra
 
 
 [40]
 Cf., e.g., Boyd v. Pointe Coupe Parish School, 5 Cir. 1974, 505 F.2d 632; Hereford v. Huntsville Bd. of Educ., 5 Cir.1974, 504 F.2d 857; Adams v. Rankin County Bd. of Educ., 5 Cir.1973, 485 F.2d 324, 325-26